# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Aljuan C. Hixon,

Plaintiff,

Civ. No. 06-1548 (RHK/JSM)

**MEMORANDUM OPINION AND ORDER**

v.

City of Golden Valley, *et al.*,

Defendants.

Andrew D. Parker, Anthony G. Edwards, Parker Rosen, L.L.C., Minneapolis, Minnesota, for Plaintiff.

Susan M. Tindal, Jon K. Iverson, Iverson Reuvers, Bloomington, Minnesota, for Defendants.

# INTRODUCTION

In this 42 U.S.C. § 1983 action, Plaintiff Aljuan Hixon has sued the City of Golden Valley, Minnesota (the "City") and four employees of the Golden Valley Police Department ("GVPD"),[1] alleging various deprivations of his constitutional rights. Defendants now move for summary judgment. For the reasons set forth below, the Court will grant Defendants' Motion in part and deny it in part.

---

[1] Police officers Dennis Arons, Mario Hernandez, and Christine McCarville, and Community Service Officer David Kuhnly.

## BACKGROUND

Viewed in the light most favorable to Hixon, see Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000),[2] the events giving rise to this action are as follows.  On August 2, 2005, Scott Herd approached a teller at the U.S. Bank in Golden Valley, which is located inside a Byerly's supermarket, and told the teller to give him the money in her drawer.  (Edwards Aff. Ex. 1.)  Herd also suggested to the teller that he had a gun.  (Id.)  Because the teller did not turn over the money as quickly as Herd wanted, he reached over the counter, grabbed a tray containing change, and then ran out of the store.  (Id.)  The teller called 911 and informed the operator that the bank had just been robbed.  (Id.)

Police in the area were advised of the robbery and were told that the "suspect is a white male, 5'8", wearing a white hat, T-shirt with a jacket, has a scruffy beard, unknown direction of travel."  (Id.)  The dispatcher later advised officers that a "weapon was implied, not seen.  The complainant states that he did ruffle his T-shirt near the waist, however, and there's no further description."  (Id.)

As Herd was racing out of the Byerly's, he nearly collided with Brian Dahlberg, who had been shopping in the store; as a result, Dahlberg decided to watch where Herd went.  (Id. Ex. 2.)  He observed Herd approach a black van parked near Byerly's, pause for several seconds by the passenger-side window, and then walk to a nearby Walgreens drug store; the

_____

[2] Although the Court must accept Hixon's version of facts for purposes of summary judgment, Defendants assert a materially different view of the relevant events.  (See infra note 9.)

van followed behind.  (Id.)  Dahlberg then got into his truck and left the Byerly's parking

lot, but decided shortly thereafter to return to the area.  (Id.)  As he did so, he observed the

black van drive to a Sinclair gas station adjacent to the Byerly's parking lot.  (Id.)  He then

began to suspect that a crime had been committed and called the police.  (Id.)  In that call,

Dahlberg described Herd to the operator and advised the operator about the black van,

which was now parked at the Sinclair station.  (Dahlberg Dep. Tr. at 53-54.)

Based on Dahlberg's information, dispatch advised officers in the area that "a

witness, who saw the victim – or the suspect, got into a black van, black van south of

Sinclair station."  (Edwards Aff. Ex. 1.)  Dispatch further advised officers to look for "[a]

black van with a white cover on the van."  (Id.)  There is nothing in that dispatch advising

officers that a black male was associated with the van or with the bank robbery.[3]

At the Sinclair, the black van parked on the opposite side of several gasoline pumps

from Hixon's Jaguar.  (Hixon Dep. Tr. at 17-18.)  Hixon – who is 6'2" tall, weighs 270

pounds, and is African-American – had driven the Jaguar to the Sinclair earlier that day for

service.  (Id. at 15, 19-20.)  Hixon spoke to the station's manager, Ron Feist, about the

Jaguar, and Feist suggested adding a quart of oil to the engine.  (Id. at 20.)  After Feist did

so, Hixon walked into the station to pay for the oil; on the way out, he noticed the black van

parked opposite the Jaguar.  (Id. at 17-18; Hixon Aff. ¶ 6.)  He then returned to the car,

---

[3] Dahlberg testified in his deposition that he told the operator that a black male wearing a white shirt was driving the van (Dahlberg Dep. Tr. at 53-54), which is consistent with the statement Dahlberg gave to the GVPD two days after the incident (Edwards Aff. Ex. 2 at 2).  The transcripts of the dispatch advisories, however, make no mention of a black male driving the van.

where he and Feist began removing debris from the engine compartment.  (Hixon Dep. Tr. at 19.)  Another customer then asked Feist for help filling a propane tank, so Feist left the area while Hixon remained alone under the Jaguar's hood.  (Id. at 19-20.)

At about this time, several police cars responding to the bank-robbery call arrived at the Sinclair station.  (Id. at 19-20.)  At least four officers, with guns drawn, hurriedly exited their vehicles and surrounded the black van.  (Hixon Aff. ¶ 8.)  Seeing the officers aiming their weapons at the van directly across the gas pumps, Hixon bent down and, with his hands raised above his head, scurried approximately eight to ten feet to the side of the gas-station building, so as not to be caught in any possible gunfire.  (Hixon Aff. ¶ 9; Hixon Dep. Tr. at 21-22.)

Upon reaching the side of the building, Hixon heard an officer order him to stop, and he complied.  (Hixon Aff. ¶ 9; Hixon Dep. Tr. at 46, 48.)  Defendant Hernandez, with his weapon trained on Hixon, ordered Hixon to step backward and get down on his knees.  (Hixon Dep. Tr. at 22.)  Hixon did so.  (Id. at 23.)  Hernandez then told Hixon to lay down on his stomach and put his face on the concrete; Hixon again complied.  (Id. at 23.)  As he laid there, defendant McCarville approached him, kicked his legs apart, and then "dove" onto his lower back with her knee, which caused immediate pain and also caused Hixon's head to hit the concrete.  (Id. at 24; Hixon Aff. ¶ 11.)  McCarville then yelled at Hixon to pass his hands to her to be handcuffed.  (Hixon Aff. ¶ 12; Hixon Dep. Tr. at 25.)  Hixon

4

passed his left hand to McCarville but was unable to pass his right hand to her.[4]  (Id. at 25-26.)  McCarville then yanked Hixon's right arm towards her, causing him "great pain," and proceeded to handcuff him.  (Id. at 25; Hixon Aff. ¶ 12.)

With Hixon handcuffed on the ground, Hernandez then asked McCarville if she wanted him to pepper-spray Hixon; McCarville said yes.  (Hixon Dep. Tr. at 26.) Hernandez then pressed his boot into the side of Hixon's neck and "blasted both of [his] eyes at point-blank range for several seconds."  (Hixon Aff. ¶ 14; Hixon Dep. Tr. at 26.) Hernandez followed that blast with a second spray aimed directly into Hixon's nostrils. (Hixon Aff. ¶ 14.)  Hernandez and McCarville then picked Hixon up, "dragged" him to McCarville's squad car, and "slammed" him into the car's trunk, injuring Hixon's knee.  (Id. ¶ 15; Hixon Dep. Tr. at 26-27.)  The two then opened the door and "threw" Hixon into the car.  (Id.; Hixon Dep. Tr. at 27.)

Hixon sat in the squad car for several minutes "in extreme pain."  (Hixon Aff. ¶ 17; Hixon Dep. Tr. at 27-28.)  His eyes and sinuses were "burning" from the pepper spray and he was having trouble breathing.  (Hixon Aff. ¶ 17; Hixon Dep. Tr. at 30.)

Meanwhile, Arons and other officers had arrested the two occupants of the black van and were attempting to ascertain their connection to the bank robbery.  (McCarville Dep. Tr. at 116-17; Arons Dep. Tr. at 101.)  At that time, Herd approached the officers,

---

[4] Hixon has a large upper body due to his "work in construction and bodybuilding."  (Hixon Aff. ¶ 12.)  He asserts that it was difficult for him to pass his right hand to McCarville because she had pinned him to the ground, with one knee on his lower back and one knee between his shoulder blades, while she held his left hand behind his back.  (Id.)

surrendered, and told the officers that Hixon had nothing to do with the bank robbery.  (Id.

at 101-02.)  Hernandez, McCarville, and Arons then approached the squad car with Feist.

(Hixon Dep. Tr. at 28.)  Feist confirmed to the officers that Hixon was a regular customer

at the Sinclair, that he had been working with Hixon on the Jaguar when the officers had

arrived, and that Hixon had nothing to do with the black van or the bank robbery.  (Id. at 29;

Hixon Aff. ¶ 19.)  The officers then huddled together and spoke for a few moments, at

which time Arons decided that Hixon should be charged with obstructing legal process.

(Arons Dep. Tr. at 102-03.)  McCarville then got into the squad car and told Hixon that he

was being taken to the GVPD station.  (Hixon Dep. Tr. at 31.)

On the short drive to the station, Hixon was coughing and spitting in the back seat of

the squad car.  (Id. at 31-32.)  However, he managed to ask McCarville "what this was all

about" and told her that "if this is a black thing, you got the wrong black guy."  (Id. at 31-

32.)  Upon arriving at the police station, Hixon told McCarville that his handcuffs were too

tight and were hurting him, and he asked her to loosen them.  (Id. at 32.)  McCarville "tried

to loosen them but did not succeed in doing so."  (Hixon Aff. ¶ 22; Hixon Dep. Tr. at 32-

33.)

McCarville then placed Hixon in a chair in the booking room.  (Hixon Aff. ¶¶ 22-23;

Hixon Dep. Tr. at 33.)  Hixon continued to cough and spit mucus onto the booking room

floor, and claims to have been hyperventilating and "passing in and out of consciousness."

(Hixon Aff. ¶ 23; Hixon Dep. Tr. at 34-37.)   He asked to be taken to a hospital because of

his difficulty breathing.  (Id. at 36.)  McCarville told Hixon that he was yelling, so his

breathing was OK.  (McCarville Dep. Tr. at 142.)

At some point, Kuhnly entered the booking room.  (Hixon Dep. Tr. at 36.)  Hixon

repeated his complaints to Kuhnly, who told Hixon to "shut up."  (Id.)  After a few minutes,

Hixon told McCarville that sitting in the chair was hurting his arms, because of the "too-

tight" handcuffs.  (Id. at 37.)  Hixon stood up and then blacked out; the next thing he

remembers, he was lying on the booking room floor.  (Id. at 37.)  McCarville and Kuhnly

then pulled Hixon upright by the handcuffs, which caused the handcuffs to "cut" into his

wrists and cause him "immediate sharp pain."  (Id.)  Hixon screamed out, and McCarville

and Kuhnly dropped him to the floor.  (Id.)

After "a long time" at the GVPD station, McCarville called an ambulance due to

Hixon's complaints about his breathing.  (Id. at 40.)  Paramedics arrived a short time later

and transported Hixon to North Memorial Hospital.  (Id. at 38-39.)  The paramedics thought

that Hixon looked like he had been pepper-sprayed, but he was not in any respiratory

distress and was not wheezing or gasping for air.  (Sempel Aff. ¶¶ 10-12, 21; Lauderbaugh

Aff. ¶¶ 12, 14-15.)  The ambulance transported Hixon without lights or sirens.  (Sempel

Aff. ¶ 17; Lauderbaugh Aff. ¶ 19.)  Hixon was released from the hospital later that day.

Hixon's case subsequently was referred to the Golden Valley City Attorney, to

prosecute Hixon for the crime of obstruction of legal process by force.  Shortly thereafter,

the charge was dropped.

On March 31, 2006, Hixon commenced the instant action in Hennepin County

District Court; Defendants subsequently removed the action to this Court.  In his Amended

Complaint,[5] Hixon asserts eleven causes of action: six state-law claims (assault, battery,

false arrest, false imprisonment, violation of the Minnesota Human Rights Act, and

*respondeat superior*) and five federal claims (excessive force, false arrest, false

imprisonment, failure to provide medical care, and a <u>Monell</u> claim against the City).

Defendants now assert that they are entitled to summary judgment on each of these claims.[6]

### STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  <u>Id.</u> at 322; <u>Mems v. City of St. Paul, Dep't of Fire & Safety</u>

<u>Servs.</u>, 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  <u>Graves</u>, 229 F.3d at 723; <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d

1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or

denials, but must show through the presentation of admissible evidence that specific facts

exist creating a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

---

[5] In February 2007, Hixon moved for leave to amend his Complaint to add a request for punitive damages.  Magistrate Judge Mayeron granted Hixon's motion by Order dated March 19, 2007 (Doc. No. 28), which Defendants did not appeal.

[6] In response to Defendants' Motion, Hixon dismissed his <u>Monell</u> claim (Count XI of the Amended Complaint).

(1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

I.      **The federal claims**

The Court begins its analysis with Hixon's federal claims, which provide the basis

for the Court's subject-matter jurisdiction.  In doing so, the Court notes that Hixon did not

specify in his Amended Complaint (or in his original Complaint) whether he has sued the

individual Defendants in their official or individual capacities.  After Defendants filed the

instant Motion, the Court advised counsel of this issue, and the parties have now stipulated

that the individual Defendants have been sued in *both* their official and individual

capacities.  (See Doc. No. 48.)  Accordingly, the Court must analyze both types of claims

when resolving the instant Motion.

### A.      **The official-capacity claims**

A suit against a public employee in his or her official capacity "is merely a suit

against the public employer."  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th

Cir. 1999) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)).  A political subdivision

may be held liable in such an action only if the plaintiff can demonstrate that the

unconstitutional acts of its employees "implement or execute an unconstitutional policy or

custom of the subdivision."  Id.  In the absence of evidence indicating that such a policy or

custom exists, summary judgment in favor of the subdivision is appropriate.  Id.

Here, Hixon has failed not only to proffer evidence of such a policy or custom, but

also to even *plead* that such a policy or custom exists.  Accordingly, Hixon's claims must

9

be dismissed against the individual Defendants, to the extent he asserts his claims against them in their official capacities. Id.; see also D.E.S. v. Kohrs, 187 F.3d 641 (Table), 1999 WL 506121, at *2 (8th Cir. 1999) (unpublished) (affirming dismissal of official-capacity claims where plaintiff had failed to plead unconstitutional policy or custom).

### B.     The individual-capacity claims

#### 1.          Excessive force (Hernandez, McCarville & Kuhnly)

In his first individual-capacity claim, Hixon alleges that Hernandez, McCarville, and Kuhnly used excessive force during (and after) his arrest. These Defendants argue that they are entitled to qualified immunity on this claim, but they are only partially correct.

When analyzing whether a police officer is entitled to qualified immunity, a court must conduct a two-part inquiry.[7] First, it must consider whether the facts alleged, when viewed in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right. If a violation could be established based on those facts, then the court must inquire whether the constitutional right at issue was clearly established at the time the violation occurred. E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004).

The constitutional right at issue here is the right to be free from the use of excessive

---

[7] Although Kuhnly is not a police officer, he was acting as a government official when he took the actions now challenged by Hixon. Hence, he also may be protected by qualified immunity, and Hixon does not argue otherwise. See Jaeger v. Dubuque County, 880 F. Supp. 640, 646 (N.D. Iowa 1995) ("[Q]ualified immunity protection is not limited just to law enforcement officers. Rather, the doctrine shields 'government officials performing discretionary functions.'") (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

force.  It is well settled that the Fourth Amendment precludes the use of excessive force by

law-enforcement officers.  E.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005).[8]  In

deciding whether the amount of force used was constitutionally excessive, the Court must

apply an "objective reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 394-96

(1989); Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006).  Under that

standard, the Court must evaluate the facts and circumstances surrounding the use of force,

"including the severity of the crime at issue, whether the suspect pose[d] an immediate

threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or

attempt[ed] to evade by flight."  Id. (quoting Graham, 490 U.S. at 396).  In performing such

an evaluation, the Court must be mindful that "officers are often forced to make split-

second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about

the amount of force that is necessary."  Graham, 490 U.S. at 397.

Viewing the record in the light most favorable to Hixon, a reasonable jury could

conclude that the amount of force used by officers Hernandez and McCarville was

objectively unreasonable.  If Hixon's recitation of the facts were accepted as true, then

there was no need for McCarville to "dive" onto Hixon's back before handcuffing him

because he was obeying commands, was not resisting arrest, and was lying on the ground,

face down, and, hence, was presenting no threat to the officers.  Nor was there any reason

for Hernandez to pepper-spray Hixon, since the pepper-spraying occurred *after* Hixon had

---

[8] There is no dispute that this right was clearly established on the date in question.

already been handcuffed and taken into custody.  Similarly, no justification exists for

McCarville and Hernandez slamming Hixon into McCarville's squad car.  See, e.g.,

Cornelious v. Brubaker, Civ. No. 01-1254, 2003 WL 21511125, at *11 (D. Minn. June 25,

2003) (Davis, J.) ("once the arrestee has been subdued, there [is] no reason for the officer

to continue to beat upon the offender").

    Hernandez and McCarville argue that the amount of force they employed was

reasonable (Def. Mem. at 20-21), but their argument is flawed for a simple reason:  it is

based on *their* version of the events culminating in Hixon's arrest.  (See, e.g., id. at 20

(asserting that "Hixon failed to comply with commands and put himself and the officers in

danger by fleeing").)[9]  Hixon, however, paints a vastly different picture of the predicate

facts than the officers.  This is precisely the type of material factual dispute that the Court

cannot resolve on summary judgment.  See, e.g., Ludwig v. Anderson, 54 F.3d 465, 474 (8th

Cir. 1995) ("[W]here, as here, there is a genuine dispute concerning predicate facts

material to the qualified immunity issue, there can be no summary judgment.") (internal

quotation marks and citation omitted); Gainor v. Rogers, 973 F.2d 1379, 1385 (8th Cir.

---

[9] The officers claim that they yelled "stop" and "don't move" when they arrived at the Sinclair station, but Hixon fled anyway.  Hernandez asserts that he chased Hixon and ordered him to stop and to get onto the ground, but Hixon disobeyed Hernandez's commands and continued to run.  Hernandez claims that he then caught Hixon and pushed him to the ground, that McCarville approached Hixon from behind and ordered him to place his hands behind his back, but Hixon refused.  Fearing that he had a weapon, the officers claim that they warned Hixon that they would pepper-spray him if he did not pass them his hands.  Hixon allegedly refused to comply, so Hernandez pepper-sprayed him.  Hixon, however, continued to resist, so Hernandez sprayed him again.  According to Defendants, at that point they succeeded in handcuffing Hixon, lifted him from the ground, and then walked him to McCarville's squad car.  (See Def. Mem. at 3-6.)

1992).

The same is not true, however, with respect to Kuhnly.  The only physical encounter Kuhnly had with Hixon occurred when Kuhnly helped Hixon stand up after he had "passed out" and fallen to the booking-room floor.  Kuhnly and McCarville simply grabbed Hixon by the handcuffs and attempted to lift him.  When Hixon cried out in pain, Kuhnly and McCarville released him, which caused him to fall to the floor.

The "force" Kuhnly used, therefore, amounted to nothing more than lifting Hixon from the ground, albeit in a way that caused the handcuffs to tighten on Hixon's wrists. Furthermore, unlike the actions taken by Hernandez and McCarville when effecting Hixon's arrest, Hixon cannot point to any injuries he allegedly sustained as a result of Kuhnly's conduct.  The Court believes that no reasonable jury could conclude that Kuhnly's use of "force" was "objectively unreasonable" and, accordingly, he is entitled to qualified immunity.  Cf. Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003) (affirming dismissal of excessive-force claim where police officers handcuffed plaintiff so tightly that one of her hands started to bleed, because plaintiff failed to offer evidence of any long-term injuries as a result).[10]

---

[10] The facts with respect to Kuhnly call to mind the oft-cited maxim: "No good deed goes unpunished."  Kuhnly was simply attempting to *assist* Hixon from the floor when he lifted him up, and he was attempting to *stop* Hixon's pain when, after Hixon cried out, he released his grip and Hixon fell to the floor.  The Court has not considered Kuhnly's intentions, however, in deciding whether his actions were objectively reasonable.  See Graham, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment claim out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Based on the foregoing, the Court will grant Defendants' Motion on Count VII with respect to Kuhnly, and will otherwise deny the Motion with respect to this claim.

### 2. False arrest (Arons, Hernandez & McCarville) and false imprisonment (Arons, Hernandez, McCarville & Kuhnly)

In his next two federal claims, Hixon alleges that Arons, Hernandez, and McCarville falsely arrested him (Count VIII), and that Arons, Hernandez, McCarville, and Kuhnly falsely imprisoned him (Count IX), in violation of the Fourth Amendment. As with the excessive-force claim, Defendants argue that they are entitled to qualified immunity on these claims. (Def. Mem. at 10-17.) The Court agrees.

At the outset, the Court notes that the parties have not separately addressed these two claims. However, it appears that Hixon predicates them on different conduct: he appears to challenge his *arrest* in the former, but his subsequent *detention* (at the police station) in the latter. Yet, the false-imprisonment claim is derivative of the false-arrest claim; if probable cause existed for the initial arrest, then probable cause necessarily existed for Hixon's detention, which was based on that arrest. Conversely, if there was no probable cause to arrest Hixon, then there could be no probable cause to detain him. Hence, the claims rise or fall together.

Turning to the merits, it is beyond peradventure that the Fourth Amendment guarantees individuals the right to be free from arrest without probable cause. E.g., Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005).[11] Even where probable cause is

---

[11] There is no dispute that such right was clearly established on the date in question.

not present, however, an officer is entitled to qualified immunity if probable cause

*arguably* existed at the time the officer effected the arrest.  Id.  This is because "the

qualified[-]immunity privilege extends to a police officer who is wrong, so long as he is

reasonable."  Id.

Although it is a close call, after viewing the facts in the light most favorable to

Hixon, the Court concludes that probable cause to arrest Hixon existed on the date in

question.  "Probable cause" exists when the "facts and circumstances within [the officer's]

knowledge and of which [the officer] has reasonably trustworthy information [are]

sufficient to warrant a prudent man in believing" that a crime had been committed.

Williams v. City of Carl Junction, 480 F.3d 871, 877 (8th Cir. 2007) (internal quotation

marks and citation omitted).  Here, there is no dispute that the officers were advised by

radio that the black van was connected to the bank robbery.  When the officers arrived at the

Sinclair station, Hixon was in relatively close proximity to the van;[12] in fact, he does not

suggest that any other individual was closer to the van than he was.  Given his proximity to

the van and the short period of time that had elapsed since the robbery had occurred, the

officers had a "reasonable suspicion" that Hixon was connected to the bank robbery.  See

United States v. Johnson, 383 F.3d 538, 542 (7th Cir. 2004) (noting that proximity of

---

[12] Hixon argues that he was "nowhere near the black van when the officers arrived."  (Mem. in Opp'n at 25.)  Although the exact position of the vehicles at the Sinclair station is not clear, Hixon admits that he was merely on the opposite side of an island containing gas pumps from the black van. (Hixon Dep. Tr. at 17; Hixon Aff. ¶ 6.)  His assertion that he was "nowhere near the black van," therefore, is disingenuous at best.

vehicle to crime scene and closeness in time to crime "are two important factors to be

considered in determining reasonable suspicion" and that quantum of evidence necessary

for reasonable suspicion "need not rise to the level required for probable cause, and . . .

falls considerably short of satisfying a preponderance of the evidence standard").  When

Hixon then "fled" the area after the officers exited their vehicles, their reasonable

suspicion "ripened . . . into probable cause to arrest."  United States v. Dotson, 49 F.3d 227,

230 (6th Cir. 1995) ("Dotson's effort to flee, coupled with Detective Gannon's reasonable

suspicion that Dotson was involved in criminal activities, established probable cause to

arrest Dotson."); accord Kelly v. Bender, 23 F.3d 1328, 1330 (8th Cir. 1994) (holding that

police officers' "preexisting reasonable suspicion coupled with Kelly's flight constituted

arguable probable cause to arrest"); United States v. Slipka, 735 F.2d 1064, 1066 (8th Cir.

1984) (probable cause to arrest existed when suspect, about whom police officer had

information suggesting connection to crime, fled upon officer's approach).[13]

---

[13] The officers also assert that they heard over their radios that the robbery suspect was associated with a black van *and a black male driver* (Hernandez Dep. Tr. at 91; Arons Dep. Tr. at 55; McCarville Dep. Tr. at 66-67; see also Def. Mem. at 13), and that this information provided them with probable cause to arrest Hixon, since he was the only black male in the vicinity of the van.  (See id.)  The dispatch transcripts, however, *contain no reference to a black male being involved in the robbery*.  (See Edwards Aff. Ex. 1.)  Moreover, Arons testified that Dahlberg "flagged him down" and told him that a black male was driving the van, and that he (Arons) then broadcast that information over the radio.  (Arons Dep. Tr. at 54-55.)  Yet, Dahlberg's own testimony belies this.  Dahlberg stated that he did not provide any information directly to Arons because he was unsuccessful in his attempts to get Arons's attention as he drove by.  Rather, Dahlberg merely telephoned the GVPD and provided dispatch with a description of the van and the driver.  (Dahlberg Dep. Tr. at 49-50.)

For these reasons, a reasonable jury could conclude that the officers were not truthful when they testified that they heard that a black male was involved in the robbery.  (See Mem. in Opp'n at 20-21.)  Accordingly, the Court has not relied on the officers' "knowledge" that a black male was

Hixon argues that probable cause did not exist because "[a] suspect's 'flight' alone is insufficient to form probable cause, or even . . . reasonable suspicion."  (Mem. in Opp'n at 23.)  The flaw in this argument is that Hixon's arrest was not predicated on his flight *alone*.  Rather, it was his proximity to the black van (which the officers had indisputably been advised was connected to the robbery), the temporal proximity to the bank robbery, *and* Hixon's flight that created the requisite probable cause.  Hixon also argues that flight is ambiguous conduct that does not necessarily suggest that the person fleeing has committed a crime.  (Mem. in Opp'n at 24 (quoting Illinois v. Wardlow, 528 U.S. 119, 129 (2000) (Stevens, J. concurring in part and dissenting in part)).)  Yet where, as here, police officers possess some indicia of criminal activity, "reactions[], such as flight, may . . . provide the necessary information, in addition to that the officers already possess, to constitute probable cause."  Kolender v. Lawson, 461 U.S. 352, 366 n.4 (1983) (Brennan, J., concurring); accord United States v. Willis, 967 F.2d 1220, 1223 (8th Cir. 1992).[14]

For these reasons, the Court concludes that the officers had probable cause to arrest Hixon and, hence, they are entitled to qualified immunity on Hixon's Fourth-Amendment

_____

involved in the robbery in concluding that there was probable cause for Hixon's arrest.

[14] Hixon claims that he did not flee but merely "trotted" 8 to 10 feet to the side of the Sinclair station. (Hixon Dep. Tr. at 21; Hixon Aff. ¶ 9.)  In the Court's view, it was reasonable for the officers to construe Hixon's movements as an attempt to flee.  Hixon also argues that, even if his actions could be construed as "flight," they were "in no way incriminating" because "no reasonable person would have stayed put and risked being killed" from potential gunfire near the gas pumps.  (Mem. in Opp'n at 24-25.)  No matter how understandable it might have been for Hixon to flee the area, however, his actions must be viewed from the perspective of a reasonable police officer on the scene. E.g., McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 n.2 (8th Cir. 2005); Garionis v. Newton, 827 F.2d 306, 309 (8th Cir. 1987).

false-arrest and false-imprisonment claims.  Accordingly, the Court will grant Defendants'

Motion with respect to Counts VIII and IX.[15]

### 3.      Failure to provide medical care

In Count X of the Amended Complaint, Hixon alleges that Defendants ignored his

"serious need for medical care," in violation of the Fourteenth Amendment.  In particular,

Hixon claims that the officers' delay in summoning medical assistance after they pepper-

sprayed him constituted deliberate indifference to his medical needs.  (See Mem. in Opp'n

at 33-34.)  The Court does not agree.

As a pre-trial detainee, Hixon's claim must be analyzed under the due-process clause

of the Fourteenth Amendment.  See Hartsfield v. Colburn, 371 F.3d 454, 456-57 (8th Cir.

2004).[16]  Pre-trial detainees "are entitled to at least as much protection under the

Fourteenth Amendment as under the Eighth Amendment."  Id.  Accordingly, courts in the

Eighth Circuit apply the Eighth Amendment's "deliberate-indifference" standard to claims

brought by pre-trial detainees concerning the denial of medical care.  See, e.g., id.; Spencer

v. Knapehide Truck Equip. Co., 183 F.3d 902, 906 (8th Cir. 1999); Patrick v. Lewis, 397 F.

---

[15] The Court pauses to note that no separate Fourth-Amendment claim lies in connection with the charge of obstructing legal process.  Because Hixon was never released from custody after he was arrested in connection with the bank robbery, "there was no subsequent arrest, and no need for probable cause," when Hixon was transported to the GVPD to be charged with obstruction.  Garionis v. Newton, 827 F.2d 306, 310 (8th Cir. 1987) ("a person who is already under arrest and in police custody cannot be 'rearrested'").

[16] All parties describe Hixon as a pre-trial detainee, but the Court believes he is more properly characterized as an arrestee.  Regardless, the same standard applies to denial-of-medical-care claims brought by pre-trial detainees as those brought by arrestees.  See Stetter v. Riddick, 6 Fed. Appx. 522, 523 (8th Cir. 2001) (unpublished).

Supp. 2d 1134, 1141 (D. Minn. 2005).  Both Hixon and Defendants agree that "deliberate indifference" is the governing standard here.  (See Def. Mem. at 22-23; Mem. in Opp'n at 32.)

"Deliberate indifference has both an objective and a subjective component."  Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).  The objective component requires a plaintiff to demonstrate that he suffered from an objectively serious medical need. Grayson v. Ross, 454 F.3d 802, 808 (8th Cir. 2006); Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997).  The subjective component requires a plaintiff to show that the defendant actually knew of, but disregarded, his serious medical need.  Grayson, 454 F.3d at 808-09; Moore, 123 F.3d at 1086.

Here, the Court assumes *arguendo* that being pepper-sprayed creates an objectively serious medical need.[17]  Hixon's claim still falters, however, on the subjective component of the deliberate-indifference test.  There is no dispute that Arons ordered McCarville to

_____

[17] The Court questions, however, whether the use of pepper spray creates an objectively serious medical need in all circumstances.  See Wagner v. Bay City, 227 F.3d 316, 324-25 (5th Cir. 2000) (deliberate-indifference claim failed despite fact that officers did not seek medical attention after pepper-spraying plaintiff); Carey v. Maloney, __ F. Supp. 2d __, 2007 WL 960030, at *6 (D. Conn. Mar. 30, 2007) (same).  Indeed, breathing problems are to be expected after pepper spray is applied, and generally those problems are only temporary.  Accordingly, there does not appear to be any reason for officers using pepper spray to assume that the breathing difficulties caused thereby require immediate medical care.  In addition, in this case, Hixon asserts that he was having trouble breathing after being pepper-sprayed, yet his own testimony demonstrates that he was repeatedly able to speak with officers between the time he was arrested and the time the ambulance arrived at the police station (Hixon Dep. Tr. at 29-36), undermining the seriousness of his breathing complaints.  And, Hixon has not identified any permanent or long-term problems he suffered as a result of being pepper-sprayed. However, because Hixon's claim fails even if the Court assumes that he suffered from an objectively serious medical need, it need not address this issue.

remain with Hixon and closely monitor him because he had been pepper-sprayed.  (Arons

Dep. Tr. at 122; McCarville Dep. Tr. at 137-38.)  Nor is there any dispute that McCarville

remained with Hixon the entire time he was at the GVPD station (Hixon Dep. Tr. at 33) or

that she ultimately summoned an ambulance for him because of his breathing difficulties

(McCarville Dep. Tr. at 138).  Simply put, these acts are inconsistent with Hixon's

assertion that the officers were deliberately indifferent to his medical needs.  See Choate v.

Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1993) (deliberate-indifference plaintiff must show

that defendant acted with a "highly culpable state of mind approaching actual intent").

Although not argued by Defendants, Hixon's claim fails for another reason.  There is

no dispute that the officers ultimately summoned medical assistance for Hixon; instead, his

claim is predicated on the officers' *delay* in seeking medical care after pepper-spraying

him.  Yet, the Eighth Circuit has repeatedly made clear that a plaintiff must "place verifying

medical evidence in the record to establish the detrimental effect of [a] delay in medical

treatment."  Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); accord Senty-Haugen v.

Goodno, 462 F.3d 876, 890 (8th Cir. 2006); Reece v. Groose, 60 F.3d 487, 491-92 (8th

Cir. 1995).  The failure to do so "precludes a claim of deliberate indifference to medical

needs."  Coleman, 114 F.3d at 784.  Here, Hixon has not proffered *any* medical evidence

concerning the effect of the delay in seeking treatment; in fact, he has not proffered any

medical evidence at all in support of his claims.

Accordingly, the Court will grant Defendants' Motion with respect to Count X.

**II.    The state-law claims**

Having concluded that several of Hixon's federal claims survive Defendants'

Motion, the Court must turn its attention to Hixon's state-law claims, over which the Court

enjoys supplemental jurisdiction. See 28 U.S.C. § 1367. Hixon asserts the following six

state-law claims in his Amended Complaint: assault (Count I); battery (Count II); false

arrest (Count III); false imprisonment (Count IV); violation of the Minnesota Human Rights

Act (Count V); and *respondeat superior* (Count VI).

### A.      Official immunity

Defendants first argue that they are entitled to official immunity on Hixon's state-

law claims. (Def. Mem. at 29-32.) Like the federal doctrine of qualified immunity,

official immunity protects public officials, including police officers, from liability for

state-law claims arising out of discretionary acts taken in the course of their official duties.

E.g., Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). There is no dispute here that the

officers' conduct was "discretionary." (See Def. Mem. at 30-31; Mem. in Opp'n at 40-41.)

Rather, the only question is whether that conduct was willful or malicious, because such

conduct is not protected by official immunity. Rico v. State, 472 N.W.2d 100, 107 (Minn.

1991).[18]

Viewing the facts in the light most favorable to Hixon, a reasonable jury could find

that McCarville's and Hernandez's use of excessive force – upon which the assault and

_____

[18] In the official-immunity context, "willful" and "malicious" are synonymous and mean "nothing more than the intentional doing of a wrongful act without legal justification or excuse." Rico, 472 N.W.2d at 107.

battery claims are based – was willful.  As set forth above, if the jury were to accept

Hixon's version of the facts, then (1) McCarville jumped onto Hixon's back for no apparent

reason, resulting in immediate pain and causing Hixon's head to hit the pavement, (2)

Hernandez stepped on Hixon's neck and pepper-sprayed him, even though he was already

handcuffed, and (3) McCarville and Hernandez slammed Hixon into McCarville's squad car.

Such conduct may fairly be characterized as "willful" and, hence, beyond the penumbra of

an official-immunity defense.  See id. at 107.

The same cannot be said for Hixon's false-arrest and false-imprisonment claims,

however.  The *sine qua non* of such claims under Minnesota law is a lack of probable

cause.  See Johnson, 453 N.W.2d at 36 ("If probable cause to arrest exists, the subsequent

arrest is lawful and there is no cause of action for false arrest or false imprisonment.");

Lundeen v. Renteria, 224 N.W.2d 132, 135 (1974).  As discussed in more detail above,

probable cause existed at the time Hixon was arrested.  Accordingly, Hixon's arrest and

detention cannot have been "wrongful acts" *ipso facto.*  Rico, 472 N.W.2d at 107.

For these reasons, Defendants are entitled to official immunity, but only with

respect to Hixon's false-arrest and false-imprisonment claims.  The Court, therefore, will

grant Defendants' Motion with respect to those claims (Counts III and IV).[19]

### B.    Assault and battery

Defendants next argue that even if they are not entitled to official immunity on

_____

[19] The Court need not address the applicability of official immunity to Hixon's MHRA claim because, as discussed below (see infra at 25-26), that claim fails as a matter of law.

Hixon's assault and battery claims, those claims still fail because they did not use excessive force on Hixon.  (Def. Mem. at 33-34.)  That argument is unpersuasive.

As to the battery claim, when a police officer uses excessive force, he or she may be liable for battery under Minnesota law.  E.g., Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980).  Because there is a genuine factual dispute as to whether officers Hernandez and McCarville used excessive force in effecting Hixon's arrest (see supra at 10-13), the battery claim cannot be dismissed against these Defendants.[20]

Similar logic applies to the assault claim.  An assault occurs when a person threatens bodily harm to another with the present ability to effectuate that threat.  Elwood v. Rice County, 423 N.W.2d 671, 679 (Minn. 1988).  If the jury were to accept Hixon's version of the pertinent facts, it could conclude that Hernandez and McCarville assaulted Hixon when they discussed using pepper spray on Hixon while standing over him.  Such action could reasonably be perceived as threatening, and it clearly occurred while the officers had the ability to effectuate the "threat."[21]

Accordingly, the Court will grant Defendants' Motion on Counts I and II with respect to Kuhnly, but will otherwise deny the Motion with respect to these claims.

## C.    MHRA

---

[20] However, Kuhnly also is named as a Defendant in the battery claim.  For the reasons discussed above (see supra at 13-14), no reasonable jury could conclude that Kuhnly used excessive force.  Accordingly, the battery claim against him fails.

[21] As for Kuhnly, Hixon cannot point to any instance of "threatening" conduct.  Hence, the assault claim against him must be dismissed.

In Count V, Hixon alleges that his assault, battery, false arrest, and false imprisonment all occurred on account of his race, in violation of the Minnesota Human Rights Act (the "MHRA").  The MHRA protects individuals against discrimination "in the access to, admission to, full utilization of or benefit from any public service because of race."  Minn. Stat. § 363A.12, subd. 1.[22]  In determining whether the MHRA has been violated, courts must look to the totality of the circumstances surrounding the allegedly discriminatory conduct.  See, e.g., State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 572 (Minn. 1994).  For example, in the context of a felony stop, relevant considerations include (1) whether there was a reasonable basis to suspect that the individual was engaged in criminal activity, (2) whether the length of the stop was unnecessarily long, and (3) whether the evidence suggests a malicious intent on the part of the detaining officers.  Id.  Ultimately, the Court must decide whether Defendants' actions here were "so at variance with what would reasonably be anticipated, absent racial discrimination, that racial discrimination is the probable explanation."  Id.

Defendants argue that the totality of the circumstances does not support any inference of racial discrimination in this case.  (Def. Mem. at 34-35.)  The Court agrees. The best that Hixon can point to in support of his claim is that the quantum of force used by the officers in effecting his arrest was excessive.[23]  In the Court's view, this fact, standing

---

[22] The GVPD provides a "public service" under the MHRA.  See City of Minneapolis v. Richardson, 239 N.W.2d 197, 201 (Minn. 1976).

[23] Hixon also argues that his arrest lacked arguable probable cause, but the Court has rejected that contention above.  Hixon further asserts that he was singled out for arrest due to his race, but the

alone, simply cannot mean that the officers' actions were undertaken on account of Hixon's race. Indeed, were that the case, any use of excessive force would amount to a *per se* violation of the MHRA. Moreover, unlike in <u>Richardson</u>, Hixon has presented no evidence that Defendants used racial epithets or other racially derogatory remarks.

Simply put, no reasonable jury could conclude that there exists any nexus between Hixon's race and the officers' conduct in this case. Accordingly, the Court will grant Defendants' Motion with respect to Count V .

### D.     *Respondeat superior*

In Hixon's final claim, he asserts that the City is vicariously liable for the individual Defendants' tortious conduct. The City argues that it is entitled to summary judgment on this claim under the doctrine of vicarious official immunity. (Def. Mem. at 32.) Under that doctrine, a governmental entity is protected from suit whenever its employees are entitled to official immunity for their allegedly tortious conduct. <u>See</u> <u>Schroeder v. St. Louis County</u>, 708 N.W.2d 497, 508 (Minn. 2006).

As set forth above, the individual Defendants are not entitled to official immunity on Hixon's assault and battery claims, but they are entitled to official immunity on Hixon's false-arrest and false-imprisonment claims. (<u>See</u> <u>supra</u> at 22-23.) Accordingly, the City is entitled to vicarious official immunity only with respect to the latter two of these claims.

---

evidence simply does not support that assertion. Indeed, there is no dispute that Hixon was in the proximity of the black van when the officers arrived at the Sinclair station. It was eminently reasonable, therefore, for the officers to "target" Hixon when he fled the scene. Hence, no reasonable jury could conclude that, by so "targeting" Hixon, the officers' conduct was the product of racial discrimination.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 32) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1.      Defendants' Motion is **GRANTED** as to Counts III, IV, V, VIII, IX, and X of the Amended Complaint and those claims are **DISMISSED WITH PREJUDICE**;

2.      To the extent that Count VI of the Amended Complaint seeks relief against the City of Golden Valley for the individual Defendants' false arrest or false imprisonment of Plaintiff, Defendants' Motion is **GRANTED** and that claim is **DISMISSED WITH PREJUDICE**;

3.      To the extent that Count VII of the Amended Complaint is asserted against the individual Defendants in their official capacities, Defendants' Motion is **GRANTED** and that claim is **DISMISSED WITH PREJUDICE**;

4.      To the extent that Counts I, II, and VII of the Amended Complaint are asserted against Kuhnly, whether in his individual or official capacity,  Defendants' Motion is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE**; and

5.      In all other respects, Defendants' Motion is **DENIED**.


Dated: June __7__, 2007                    s/Richard H. Kyle
                                           RICHARD H. KYLE
                                           United States District Judge