UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
_____

Aljuan C. Hixon,                                    Case No. 06-Civil 1548 (RHK/JSM)

        Plaintiff,

    v.

                                   **PLAINTIFF'S TRIAL BRIEF**

City of Golden Valley,
Dennis Arons,
Mario Hernandez,
David Kuhnly, and
Christine McCarville,

        Defendants.
_____

## I.   INTRODUCTION

    This is an egregious case of police brutality and abuse of authority, against an innocent man having his car serviced at his local gas station.

    On April 2, 2005, the Defendant officers pointed guns at Plaintiff Al Hixon, pushed him to the ground, jumped on him, handcuffed him, pepper-sprayed him repeatedly in the face at point-blank range <u>after</u> he was handcuffed, and threw him against the trunk of a squad car.  The Defendants were responding to the robbery of a US Bank branch by a Caucasian male.  Mr. Hixon is African-American.  It is undisputed that he had nothing to do with the robbery.  Mr. Hixon offered no resistance to being arrested that might have justified the arresting officers' use of force.  Defendant officers attacked Mr. Hixon claiming they thought he was a criminal.  Their attack was unjustified.  Plaintiff will show that the officers' conduct after learning Mr. Hixon was not involved in

the robbery is further proof of their consciousness of guilt regarding their use of excessive force.

## II.   FACTS

### A.   Al Hixon.

In 1995, Plaintiff Al Hixon earned the McKnight Foundation Award for his community-service work.  In 1997, Mr. Hixon received the "40 Under 40" Award from The Minneapolis/St. Paul Business Journal, naming him one of the top 40 businesspeople and community leaders under age 40 in Minnesota.  Mr. Hixon holds a bachelor's degree in electrical engineering, and has completed all required course work for a master's degree in software engineering.  Mr. Hixon is married and has three daughters ages 10, 8 and 3.

Mr. Hixon owns and operates a residential construction firm, AMB Construction. He previously worked in professional and/or executive positions for Honeywell, Norwest Bank, U.S. West, and Hennepin County Medical Center.  He is an honorably-discharged veteran of the U.S. Army Reserves.

Prior to April 2, 2005, the date of the subject incident, Mr. Hixon had never been arrested, nor convicted of a crime of any kind.

### B.   The Bank Robbery.

At about 1:45 p.m. on April 2, 2005, Scot Herd, a six-foot-tall, 175-pound, Caucasian man, approached the counter of the US Bank branch at Byerly's grocery store in Golden Valley.  He told the bank teller, Kelli Schnobrich, to give him the money in her

drawer.  Mr. Herd then reached over the counter and took a tray of change before running out of Byerly's.

Schnobrich activated the bank's silent alarm and called 911.  She described the robber to the 911 dispatcher, who in turn radioed squad cars that the robber was a "white male, 5'8" wearing a white hat, T-shirt with a jacket, has a scruffy beard."

As Mr. Herd ran out of the store, he nearly collided with Brian Dahlberg, an employee of the City of Golden Valley.  Mr. Herd ran past Dahlberg and approached a black van.  After standing near the van for several seconds, Mr. Herd walked to the nearby Walgreen's, and the van followed.  Dahlberg walked to his truck and drove out of the parking area.  As he drove away, Dahlberg saw two squad cars driving quickly to the scene.

Dahlberg became suspicious.  He drove back near Byerly's and saw the black van drive to a Sinclair station adjacent to the parking lot of the Byerly's.  Dahlberg attempted to flag down one of the police officers (who he knew personally) before calling 911 on his cellular phone.  He told a 911 dispatcher that he had seen a white male run out of the Byerly's and up to a black van.  He further reported that the black van had since driven to the nearby Sinclair station.

Defendants claim that they were also informed prior to arriving at the Sinclair station that there was a black male driver or occupant in the black van.  Defendants cannot establish this fact and Plaintiff will disprove it.

C.     <u>**Mr. Hixon at His Neighborhood Service Station.**</u>

As the robbery at US Bank was unfolding, Mr. Hixon was at the Sinclair service station in Golden Valley, near Byerly's, having his Jaguar serviced after several months in storage.  Mr. Hixon regularly patronizes the station.  Mr. Hixon was parked at the gas pumps closest to the southwest corner of the service station building.  Mr. Hixon went into the station to pay for a quart of oil.  On his way out, Mr. Hixon saw a black van pulled forward of the pump on the opposite side of the pump island from his car.  Mr. Hixon's car was pulled forward of the pump island, facing in the opposite direction.

Station manager Ron Feist and Mr. Hixon were looking under the hood of the Jaguar when another customer asked Feist to help fill his propane tank.  Mr. Hixon remained under the hood of his Jaguar, standing on the side of his car farthest from the van and closest to the Sinclair station building.  He was looking down and focused on cleaning debris from under the hood.

Several Golden Valley Police Department ("GVPD") squad cars drove up from driveways at either end of the station.  Mr. Hixon looked up from under his hood and saw the police, with guns drawn, focused on the black van.

After Mr. Hixon saw the police with guns drawn toward the gas pump area, he became immediately afraid of being caught in a crossfire.  He ducked, put his hands over his head, and moved toward the Sinclair building for cover.  At the moment Mr. Hixon reached the side of the Sinclair building, a few paces away, he heard one or more officers telling him to stop.  He immediately stopped.

Defendant Mario Hernandez ("Hernandez") approached Mr. Hixon with his gun drawn, and told Mr. Hixon to take a few steps back and get down on his knees.  Mr. Hixon did so.  Hernandez then told Mr. Hixon to get down on his stomach and put his face on the concrete.  Again, Mr. Hixon cooperated fully.  Mr. Hixon was afraid, and was at all times fully compliant.

As Mr. Hixon lay on the ground facedown, Defendant Christine McCarville ("McCarville") approached him and kicked his legs apart.  Without warning, she then dove down onto Mr. Hixon's lower back with her knee, causing severe pain and causing Mr. Hixon to hit his forehead hard against the asphalt.

McCarville yelled at Mr. Hixon to pass her his arms to be handcuffed.  Mr. Hixon lifted his left arm and McCarville put a handcuff on his left wrist.  McCarville had one knee on Mr. Hixon's lower back and one knee on his upper back between his shoulder blades, applying her full weight in holding Mr. Hixon tightly to the cement.  In this position, holding his left arm already cuffed behind his back, it was difficult for Mr. Hixon, who has a larger upper body, to lift his right arm into position to be handcuffed, but he offered his right hand.  McCarville yanked Mr. Hixon's right arm toward her, hurting him, and bound Mr. Hixon with handcuffs near the middle of his back.

In what Plaintiff will show was an after-the-fact effort to justify their conduct, Defendants claim Mr. Hixon tucked his arm under his chest in defiance of their commands.  Plaintiff will show that this is not true.  It is not disputed that Mr. Hixon did not at any time struggle with the officers, punch or kick them, spit at them, physically or

verbally threaten them, yell or swear at them, or attempt to do any of these things. Plaintiff will show he was fully compliant in every way.

After Mr. Hixon was handcuffed, and lying facedown on the ground, Hernandez asked McCarville "Do you want me to spray him?"  McCarville said "Yes."  Hernandez put his boot on the side of Mr. Hixon's neck and blasted Mr. Hixon's eyes at point-blank range for several seconds, in a back-and-forth motion, with pepper spray.  Hernandez then pointed the spray nozzle up Mr. Hixon's nose and sprayed a second blast of pepper spray directly into both nostrils.

Hernandez and McCarville grabbed Mr. Hixon and dragged him to a squad car. They slammed his body onto the trunk of the car, then threw him into the car, pushing him in with their feet.

As Mr. Hixon sat locked in the car, his eyes and sinuses were burning, and he struggled to breathe due to the effects of the pepper spray.  Mr. Hixon was hyperventilating and passing in and out of consciousness, and thought he was dying.  Mr. Hixon was tightly handcuffed, behind his back, the entire time.  Mr. Hixon repeatedly asked for help and to be taken to a doctor.  Regardless, the Defendants did nothing for him.

**D.    Others Confirm Mr. Hixon Was Uninvolved in Robbery.**

After Mr. Hixon was in custody, the white male bank robber walked up to the Defendant officers and admitted he had committed the robbery and that nobody else was involved.  Ron Feist, manager of the Sinclair station, walked over to the squad car where Mr. Hixon was being held, and asked Defendants Arons, Hernandez, and McCarville why

they had Mr. Hixon in custody.  Feist told the officers that Mr. Hixon was a regular customer and that Mr. Hixon had nothing to do with the black van, nor the robbery.

Defendants had an innocent, handcuffed, pepper-sprayed black man in the back of their squad car.  The officers needed a story and they needed a reason to justify his arrest. Lead officer Arons called Officers Hernandez and McCarville together to decide what to do.  Notwithstanding Mr. Hixon's non-involvement in the robbery and his consistent cooperation with the officers, and in spite of his obvious physical distress, Defendant officers decided to keep Mr. Hixon handcuffed, take him to the police station for booking, and refer him for charges.

**E.    Mr. Hixon Taken Handcuffed to Police Station.**

McCarville drove Mr. Hixon to the police station.  During the drive, he continued to struggle to breathe, coughing and spitting up mucus due to the effects of the pepper spray.  McCarville yelled at him to stop spitting in her car.  Mr. Hixon repeatedly told McCarville that he could not breathe, and begged her to take him to the hospital.  She refused.  Mr. Hixon asked McCarville what this was all about, and told McCarville "If this is a black thing, you got the wrong black guy."  McCarville responded, "That's what you all say."

Upon their arrival at the GVPD, McCarville took Mr. Hixon into a booking room. Mr. Hixon asked McCarville what was going on.  McCarville told him she was holding him until his "friends" arrived.  Mr. Hixon was hyperventilating and losing consciousness in the booking area.  Mr. Hixon asked repeatedly to be taken to the hospital, and to call his attorney.

McCarville directed Mr. Hixon to sit in a chair in the booking room. Mr. Hixon kept telling Defendant McCarville that he could not breathe. McCarville responded by telling him to shut up. After sitting in a chair for several minutes, Mr. Hixon told McCarville that sitting was hurting his arms, reiterating his handcuffs were too tight. Mr. Hixon stood up, then lost consciousness, falling to the floor.

From the time of his initial detention and handcuffing, Mr. Hixon was never released from his handcuffs nor assisted with the effects of the pepper spray or his other injuries until paramedics arrived. At no time did any officer check Mr. Hixon's criminal record to see if the officers had any reason to view this innocent man as a safety risk.

More than an hour after Mr. Hixon's initial arrest, paramedics arrived at the police station. They immediately told the police officers to take the handcuffs off of Mr. Hixon. The paramedics took Mr. Hixon by ambulance to North Memorial Medical Center ("NMMC"). Shortly thereafter, Mrs. Hixon and the Hixons' young children found their husband and father lying in pain in the hospital emergency room at NMMC.

## F.     **Defendant Officers Refer Mr. Hixon For Charges Which Were Then Dropped.**

Following the incident, the Defendant officers referred Mr. Hixon's case to the City Attorney for prosecution for obstruction of legal process with force. Within days, GVPD Chief Roger Johnson contacted the City Attorney directing that the charges be dropped entirely. Mr. Hixon has never been charged with any wrongdoing. To date, the Defendants are unable to identify any credible basis for the charge of obstruction of legal process with force. Plaintiff will show that the officers' treatment of him following his

arrest was an attempt to create facts that would cover them for their unreasonable and unnecessary use of force against Plaintiff during his initial arrest.

**G.    Mr. Hixon Suffers Injuries and Is a Changed Person.**

As a result of the subject incident, Mr. Hixon suffered a laceration on the front of his head, from striking the concrete after McCarville dove onto Mr. Hixon's back with her knee.  His lower back was painful and swollen, and he has continued to suffer from residual back pain.  He had a "knot" of swelling on the side of his neck from where Hernandez had stepped on it.  His tear ducts were dry and didn't work properly for several days, and he has continued to have problems with his eyes since his exposure to pepper spray.  Mr. Hixon has been diagnosed with post-traumatic stress disorder and depression, and he has also been diagnosed with mild to moderate cognitive impairment since his arrest.  Mr. Hixon will show that this has been a disastrous, life-changing event for him.  He lives in fear and, put simply, is not the same person he was before the incident of April 2, 2005.

## III.    APPLICABLE LAW

**A.    Individual Officers.**

**1.    Federal-Law Claims.**

Plaintiff intends to prove that Defendants used unreasonable force on Plaintiff in violation of his Fourth Amendment constitutional rights.  "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizure of the person."  See Guite v. Wright, 147 F.3d 747, 760 (8th Cir. 1998).  "[T]he test is whether the force used to effect a particular seizure is

'reasonable.' '[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" See Id. at 760, quoting Graham v. Connor, 490 U.S. 386, 396 109 S.Ct. 1865, 1872 (1989).  There is no precise definition of the elements of "reasonableness," but the reasonableness of the involved officers' actions should be assessed based on the facts and circumstances of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  See Graham, 490 U.S. at 396, 109 S.Ct. at 1872.

Here, the Defendants, maliciously and without justification, used extreme force and violence in arresting and detaining Mr. Hixon, notwithstanding the fact that he was fully compliant.  The Graham factors fully support Mr. Hixon's claim.

It is undisputed that Mr. Hixon had no involvement in the bank robbery that led to the officers' response, and further undisputed that he bore no physical resemblance to the robber.  The Defendants claim that they suspected Mr. Hixon based on information provided by Brian Dahlberg, who related seeing the robbery suspect approach a black van containing a black male.  Remarkably, however, the Defendant officers and Mr. Dahlberg (a City employee who happens to have a longtime acquaintance with Defendant Arons, the senior officer on the scene) offer conflicting versions of how this information was relayed to the officers.  In any case, the City can produce no record indicating that the

officers knew about a black male before arriving at the Sinclair station, and the police dispatchers involved have no memory of receiving and conveying this information.

Defendants further claim they were justified in forcefully arresting Mr. Hixon based on his "flight."  As noted above, however, Mr. Hixon moved only a few paces, to avoid being caught in a crossfire and stopped when told to stop.  His actions cannot be construed as resistance or noncompliance, and certainly provide no justification for the abusive use of force used in this case.

Defendants also contend that pepper spray was used on Mr. Hixon only after he resisted arrest by refusing to produce one of his arms to be handcuffed and tucking it under his body.  The evidence will establish Defendants are lying about this allegation. Similarly, the officers' referral of criminal charges against Mr. Hixon for obstruction of legal process with force was fabricated in an attempt to bolster their contention that the force used was reasonable.

Ultimately, the evidence will show that the resistance and noncompliance of Mr. Hixon alleged by Defendants is a false story, fabricated in an attempt to justify the brutal, wrongful arrest of a black man.  None of the officers even claims that Mr. Hixon used or threatened any measurable level of force toward the officers.  The officers had no cause for the use of force toward Mr. Hixon, much less the gratuitous violence used by the Defendant officers <u>after</u> Mr. Hixon was handcuffed and subdued.

### 2.      State-Law Claims.

In addition to his federal claims, Plaintiff alleges common-law claims for assault and battery against Defendants Hernandez and McCarville.  "'An assault is an unlawful

threat to do bodily harm to another with present ability to carry the threat into effect.'" See Thomsen v. Ross, 368 F. Supp. 2d 961, 976 – 77 (D. Minn. 2005), quoting Dahlin v. Fraser, 288 N.W. 851, 852 (Minn. 1939).   "A battery is defined as an intentional unpermitted offensive contact with another."   See Paradise v. Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980).  Although a police officer may use reasonable force in making an arrest, if arresting officers have "used excessive force, their touching of plaintiff would be unpermitted and thus constitute a battery."  See Id.

Here, as discussed above, the evidence reflects no legitimate justification for the use of force by the Defendant officers, and accordingly their actions toward Mr. Hixon constitute assault and battery under the law.

## B.    Respondeat Superior.

Under the principle of respondeat superior, an employer is vicariously liable for an employee's torts committed within the course and scope of employment.  See Farendorff v. North Homes, Inc., 597 N.W.2d 905, 910 (Minn. 1999).  "Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business."  See Id.  The Minnesota Supreme Court has interpreted the doctrine to hold an employer liable for even the intentional misconduct of its employees when "(1) the source of the attack is related to the duties of the employee, and (2) the assault occurs within work-related limits of time and place."  See Id., citing Lange v. Nat'l Biscuit Co., 297 Minn. 399, 404, 211 N.W.2d 783, 786 (1973).  An "important consideration in determining whether an act is related to the duties of employment is

12

whether the act was foreseeable."  See Hagen v. Burmeister & Assoc., 633 N.W.2d 497, 504 (Minn. 2001).

Here, it is undisputed that Defendant officers were on duty at the time of the subject incident, and that their use of force against Al Hixon occurred in the course of their duties.  It is, moreover, foreseeable that police officers will use force in arresting persons, hence the fact that they are armed and trained in the use of force.  There should be no dispute that, to the extent Defendant officers are found to have used excessive force against Mr. Hixon, the City of Golden Valley will be liable as well.

**C.**     **Damages.**

Mr. Hixon suffered the following physical injuries as a result of the April 2, 2005 incident:

- Severe injuries to his eyes, skin, nose and lungs as a result of pepper spray, causing painful and difficult breathing and vision, as well as burning skin, for several weeks following the incident;

- Soft tissue injuries to back, neck, elbows and shoulders;

- Injury to his forehead, caused by impact with the ground; and

- Contusions and abrasions over his entire body.

In addition to the physical injuries he sustained, Mr. Hixon's mental health was severely affected by the events of April 2, 2005.  He has been diagnosed with post-traumatic stress disorder (PTSD) and depression.  Testing at the Courage Center also reveals significant cognitive problems resulting from the incident, which will permanently affect Mr. Hixon's ability in various areas of his life.

Mr. Hixon has received medical bills totaling approximately $7,800 for various medical and psychiatric treatment he has received since the incident. He is continuing to treat, and his providers will testify that he will continue to require medical and psychiatric care in the future.

Mr. Hixon has also suffered severe past and future pain and suffering related to the subject incident. Mr. Hixon's family, friends, and work colleagues will corroborate that the emotional distress, mental anguish, embarrassment and humiliation Mr. Hixon suffered at the hands of the Golden Valley Police Department have affected every aspect of his daily life. This is a man who has worked hard, his entire adult life, to be the best man he could, to provide for his family, and to improve his community. This incident has been devastating to Mr. Hixon, who will simply never be the same, and has taken a great toll on his relationship with his wife and his three daughters.

The Court has ruled that Mr. Hixon is entitled to pursue punitive damages in this case, pursuant to Smith v. Wade, 461 U.S. 30 (1983). A jury may be permitted to assess punitive damages in an action under 42 U.S.C. § 1983 where the defendants' conduct involved reckless or callous indifference to a plaintiff's federally-protected rights, as well as when it is motivated by evil motive or intent. See Id. Plaintiff will show that Defendants' conduct in brutally taking Mr. Hixon into custody and then creating facts to cover up and justify their conduct warrants an award of punitive damages.

* * *

Plaintiff's counsel estimates that the trial of this case, including jury selection and jury charge, will take roughly six to eight full trial days, depending upon requested stipulations to which Plaintiff, to date, has not received a response.

Dated this 17th day of August, 2007

Respectfully submitted,

PARKER ROSEN, LLC


By:_____s/Andrew D. Parker_____
        Andrew D. Parker      #195042
        Anthony G. Edwards   #342555
        133 First Avenue North
        Minneapolis, Minnesota 55401
        Telephone: (612) 767-3000

        ATTORNEYS FOR PLAINTIFF