# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

_____

| | | |
|---|---|---|
| Aljuan C. Hixon, | ) | Case No. 06-Civil 1548 (RHK) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF LAW IN** |
| | ) | **OPPOSITION TO DEFENDANTS** |
| City of Golden Valley, | ) | **HERNANDEZ AND CITY OF** |
| Dennis Arons, | ) | **GOLDEN VALLEY'S MOTION** |
| Mario Hernandez, | ) | **FOR NEW TRIAL OR IN** |
| David Kuhnly, and | ) | **ALTERNATIVE REMITTITUR** |
| Christine McCarville, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## I.  INTRODUCTION

The Plaintiff and Defendants told an entirely different story about what occurred on April 2, 2005.  This case turned on the relative credibility of Plaintiff Al Hixon and the police officers who arrested him.   At trial, the evidence demonstrated, and the jury found that Plaintiff did not resist arrest and that Defendant Mario Hernandez used excessive force in arresting Plaintiff.   The Defendants' version of events was not believed, as the credibility of the officers involved was repeatedly undermined throughout the trial.   While Defendants attempted to challenge Mr. Hixon's credibility, most notably by asserting he was exaggerating his claimed physical and psychological injuries, Defendants failed. The evidence overwhelmingly supported the credibility and veracity of Mr. Hixon

including his consistent testimony that he never resisted any of the officers' actions and that his injuries were real and not overstated.

Having lost at trial based on the jury's credibility findings, Defendants now ask the Court to revisit a host of evidentiary issues on which the Court has already ruled after considering both extensive written and oral argument.   Contrary to Defendants' blunderbuss list of arguments claiming evidentiary rulings should have been more restrictive, the Court's evidentiary rulings regarding Plaintiff's evidence were in fact quite restrictive.   The Court effectively carried out its evidentiary goalkeeping function.   As described more fully below, the Court's evidentiary rulings were amply supported by law and well within the discretion of the Court.   If anything, the evidence excluded compromised Plaintiff's ability to fairly present his case.

Defendants also ask the Court for remittitur on the issue of damages, arguing that the jury's verdict was excessive and that its punitive damages award was the result of passion and prejudice.   In fact, there was overwhelming evidence to support the jury's verdict.   As it relates to compensatory damages, the evidence was largely uncontroverted because all of the medical providers agreed.   The jury's punitive damages award was based largely on testimony that Defendants themselves elicited.   The record in this case established a serious violation of Plaintiff's constitutional rights which was exacerbated by the Defendants' lies and outrageous indifference.   There is no legal basis for granting a new trial, nor a grant of remittitur in this case.   Defendants' Motion must be denied in full.

## II.   **RELEVANT FACTS**

This case was tried to a jury on September 6, 7, 10, and 11, 2007. Plaintiff's presentation began with the testimony of Defendants Mario Hernandez and Christine McCarville, the officers accused of using excessive force in arresting Plaintiff.  Defendants Hernandez and McCarville were adamant that they had done nothing wrong during Plaintiff's arrest.  Their testimony was shown to be not believable.

### A.   **Credibility Regarding Liability.**

Both officers testified unequivocally and repeatedly on their oath that before arriving at the Sinclair station where Plaintiff was arrested, they had heard by car-to-car radio from Sergeant Dennis Arons, and only from Sergeant Arons, that the black van suspected to be the getaway vehicle in the robbery of the nearby U.S. Bank branch, contained a black male.[1]

Plaintiff next called Sergeant Dennis Arons, the senior officer involved in Mr. Hixon's arrest.   Sergeant Arons testified as unequivocally and again repeatedly on his oath that upon arriving at the scene of the bank robbery, he was flagged down by Brian Dahlberg, an employee of the City of Golden Valley. Sergeant Arons stated Brian Dahlberg told him that Mr. Dahlberg had seen a white male run out of the Byerly's store toward a black van containing at least one black male, which had since moved to the nearby Sinclair service station.   Sergeant

---

[1] As the Court is aware, the recording produced by the police dispatchers involved, admitted as Trial Exhibit 15, includes no information about a black male suspect.

Arons testified that he immediately radioed this information to the other responding officers by car-to-car radio.

Plaintiff then, in order, called Brian Dahlberg, the City employee who saw the bank robber run out toward the black van.  Brian Dahlberg testified that <u>he did not flag down Sergeant Arons, and in fact he did not speak to him at all that day until after Mr. Hixon's arrest</u>, directly contrary to the testimony of Sergeant Arons and, thus, showing Officers Hernandez and McCarville to have lied about the radio communication from Sergeant Arons.

The officers' credibility was further undermined by Mr. Dahlberg's testimony that he had watched Mr. Hixon for several minutes following his arrest and, contrary to the testimony of the involved officers, Mr. Hixon was never permitted to leave the police car in which he was confined.

Sinclair station employees Dave Greenwood and Ron Feist, called by the Plaintiff and by Defendants respectively, also testified at trial.  Their testimony entirely supported Plaintiff's description of his arrest, including the manner in which he moved to the side of the building.  Their testimony also supported Mr. Hixon's description of events following the arrest.  Their testimony further undermined the credibility of the officers' versions of events.

Moreover, the testimony of the Defendant officers regarding the alleged tucking of Mr. Hixon's arm during handcuffing was undermined by Officer Hernandez's physical description of events and Officer McCarville's written report of the incident.  In addition, the emergency room report noting an injury to

the left side of Mr. Hixon's head was important evidence supporting Mr. Hixon's version of events regarding Officer Hernandez stepping on the side of his head and again undermined the credibility of the officers' story.

These are just a few examples of the overwhelming weight of the evidence showing that the officers' testimony fabricated what occurred on April 2.

**B.      Credibility Regarding Damages.**

As it relates to damages, Mr. Hixon's treating psychiatrist, Dr. John Shirriff, and treating psychologist, Ginny Jacobs, testified that Mr. Hixon suffers from severe, chronic post-traumatic stress disorder ("PTSD") and depression directly caused by his arrest on April 2, 2005.  The gravity of the effect this incident has had on Mr. Hixon was further supported by the testimony of Mr. Hixon's wife, Sheri Hixon, and his friends, Dr. Verna Price and Dennis Hodgdon, who all testified that they have observed a wholesale change in Mr. Hixon's personality and behavior since his brutal arrest.  Mr. Hixon's psychological and physical injuries were further supported by his own testimony and a variety of medical records and bills.[2]  Plaintiff's evidence regarding his psychological and physical damages was unrebutted (presumably because Defendants' independent medical examiner, Dr. Cris Johnston, fully concurred that Mr. Hixon suffers from severe, chronic PTSD and depression caused by the April 2, 2005 incident).  The evidence in the record was overwhelming that the acute nature of Mr. Hixon's

---

[2] See Trial Exhibits 27-30, 32, 34, 36-38 and 40.

psychological injuries was due to the egregious nature of the officers' conduct and Mr. Hixon's background.

**C.     Punitive Damages.**

Plaintiff presented a variety of evidence which militated in favor of a sizable punitive damages award.  This evidence was believed and adopted by the jury through their verdict.

Specifically, the evidence showed that Defendant Hernandez, <u>after</u> Mr. Hixon was handcuffed, lying facedown on the ground, and fully cooperating with the arresting officers¸ asked Defendant McCarville whether she wanted him to spray Plaintiff.   When she said "yes," Defendant Hernandez stepped on Mr. Hixon's neck, and directed two long blasts of pepper spray into Mr. Hixon's eyes and nostrils at point-blank range.

Defendants themselves admitted at trial that they learned within a few minutes after handcuffing Mr. Hixon that he was completely uninvolved in any bank robbery, and that he was a longtime customer of the Sinclair station, there to have his car serviced.  Notwithstanding, Defendants never apologized or released Mr. Hixon instead they held him handcuffed in police custody for more than an hour, denied him needed and requested medical attention, provided him no opportunity to rinse his face or call his wife.  Defendants' abuse continued even after Mr. Hixon was taken away by ambulance, as they referred him for an unsupported criminal charge of obstruction of legal process with force, an effort to

justify their brutality toward him.  Defendants were indifferent to the rights of Plaintiff and showed malice in their treatment of him.

Defendants made matters worse under direct examination, by falsely testifying about their knowledge of a black male suspect (a lie that defense counsel did not even attempt to explain), about the "foot chase" involving Mr. Hixon, about Mr. Hixon resisting by tucking his arm under his body, about their claim that they used pepper spray on Mr. Hixon <u>before</u> he was handcuffed, and about letting Mr. Hixon out of the police car to sit on the grass after learning he was uninvolved in the bank robbery.

Moreover, in spite of all of the evidence of police misconduct presented at trial, Sergeant Dennis Arons, the senior officer involved in Mr. Hixon's arrest, testified under direct examination that he was "proud" of the way his officers had handled the arrest, and that he hoped they would handle similar arrests in the future the same way.

## III.   **ARGUMENT**

### A.   **DEFENDANTS' MOTION FOR A NEW TRIAL IS BASELESS AND MUST BE DENIED.**

#### 1.   **Legal Standard and Burden of Proof.**

Federal Rule of Civil Procedure 59, provides, in relevant part:

> A new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

F.R.Civ.P. 59(a).  A motion for a new trial may be:

> bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

"[M]otions for a new trial should . . . be granted cautiously and sparingly and only in the furtherance of substantial justice . . . the burden in demonstrating error is a heavy one." Hanson v. Barrett, 186 F.Supp. 527, 532 (D.Minn.1960) (quotation omitted). The grant of a motion for a new trial is inappropriate unless "the verdict is against the weight of the evidence and [] allowing it to stand would result in a miscarriage of justice." Lloyd v. Am. Airlines, Inc., 291 F.3d 503, 508-09 (8th Cir. 2002). "When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not." White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992) (citation omitted).

**2.    The Court's Evidentiary Rulings Were Fair and Balanced, and Created No Unfair Prejudice to Defendants.**

"Decisions about the admissibility of evidence during trial are within the trial court's broad discretion." DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 467 (8th Cir. 2000). For this reason, the appellate courts "review evidentiary decisions very deferentially, reversing only upon a showing that the trial court has 'clearly abused its discretion.'" Jefferson v. Vickers, Inc., 102 F.3d 960, 963 (8th

Cir. 1996), quoting United States v. Johnson, 857 F.2d 500, 501 (8th Cir. 1988).

Incorrect evidentiary rulings may warrant a new trial under Rule 59 when the

rulings were so prejudicial as to require a new trial which would be likely to

produce a different result.  See O'Dell v. Hercules, Inc., 904 F.2d 1194, 1200 (8th

Cir. 1990).

Defendants have raised a host of evidentiary issues regarding this case,

claiming that the issues warrant a grant of a new trial.[3]  Defendants claim that

Plaintiff, counsel, and witnesses improperly made "repeated references . . . to

Plaintiff as a good citizen, his upbringing, race, and the charges and

recommendation not to prosecute Plaintiff."[4]  This inaccurately states the record.

Each of these issues was previously briefed and argued to the Court, and Plaintiff

at no time went beyond the evidentiary boundaries imposed by the Court in its

presentation of the evidence, except for one unexpected utterance by witness

Ginny Jacobs that went beyond the question asked and referred to a comment

made by Plaintiff's mother during his upbringing that Ms. Jacobs believed was

relevant to her treatment.  This single reference was stricken, corrected, and

harmless.[5]  Moreover, the Court' rulings were balanced and indicate no unfair

favoritism toward Plaintiff.

---

[3] See Defendants Hernandez and City of Golden Valley's Memorandum of Law in
Support of Motion for New Trial or In the Alternative Remittitur ("Defendants'
Memo"), pp. 5-19.

[4] See Defendants' Memo, p. 6.

[5] See the Court's Order on Motions in Limine, at Docket No. 108 (ruling on the
parties' evidentiary motions).

### a.  Plaintiff Did Not "Play the Race Card."

Defendants assert that "the race card was repeatedly played at trial by Plaintiff's counsel, which precluded Officer Hernandez from receiving a fair trial."[6] Defendants' description of what occurred at trial is false.  Plaintiff at no time exceeded the Court's evidentiary prohibitions on the issue of race.

Defendants first claim that Plaintiff elicited testimony about being raised in Birmingham, Alabama during the civil rights movement.  The Court's pretrial Order allowed limited examination about the fact that Plaintiff was raised in Birmingham during the 1960's, but no reference to the civil rights movement occurring in Birmingham at that time.  The Court also excluded any reference to the fact that Mr. Hixon was raised in a racially-mixed neighborhood, and lives in one today.

The evidence allowed by the Court was related directly to Plaintiff's damages and an important part of his treatment, and raises no implication that the Defendant Officers are racists or that race played a role in their actions.  Plaintiff never went beyond the boundaries of the Court's order.

Defendants go on to complain that Ginny Jacobs testified that Plaintiff was taught as a child to obey police.  As already mentioned, Ms. Jacobs did unexpectedly blurt out a reference to this information in response to a general question, but it was objected to and stricken by the Court.  There could be no prejudice by this single utterance.

---

[6] See Defendants' Memo, p. 7.

Defendants' complaint that Plaintiff described telling Defendant McCarville, "If this is a black thing, you have the wrong black guy," is equally misplaced – Plaintiff had the right to testify about what was said following his arrest, and given that the jury found no liability on Defendant McCarville's part, the testimony could have had no prejudicial effect.

Defendants also, remarkably, object to Plaintiff's presentation of evidence that the police officers involved in his arrest colluded to fabricate knowledge of a black male suspect at the time they arrested him.[7]   The Court specifically ruled that this information was admissible after receiving briefs and argument on this issue.  First, as it relates to this evidence, Plaintiff <u>never</u> implied or argued that the officers' fabrication meant the Defendants were motivated by racism in their use of force toward him.  Second, this entire case hinged on credibility, making the presentation of this evidence essential.  Credibility is a paramount issue in police use-of-force cases.  <u>See</u> <u>Rush v. Smith</u>, 56 F.3d 918, 921 (8th Cir. 1995) (noting the "critical importance of the jury's assessment of witness credibility" in civil rights cases).  Moreover, remarkably, <u>the evidence of Defendants' fabrication of evidence was unrebutted.</u>  Defendants offered no evidence, nor even any argument, that purported to explain the inconsistency between the testimony of Defendants Hernandez and McCarville and Sergeant Arons, who claimed they learned of a black male suspect through Sergeant Arons face-to-face conversation

---

[7] The Court itself made reference to this critical evidence in its Order Granting Partial Summary Judgment (Docket No. 50), p. 16, note 13.

with Brian Dahlberg, and the testimony of Mr. Dahlberg, who denied that the conversation ever occurred.

Ultimately, the jury's verdict reflects their conclusion that the officers involved in Plaintiff's arrest were liars, not racists.  Plaintiff said nothing about race during trial except as an identifying feature as used by dispatch related to the robbery.  To the extent that race was a theme at trial, that was an unavoidable consequence of the fact that the Golden Valley Police brutally arrested a black man for a crime committed by a white man, rather than any impropriety at trial.[8] Moreover, because Plaintiff's presentation included no improper racially inflammatory testimony or argument, there was no reason for the Court to provide any curative instruction, as Defendants contend was required.[9]  Racial animus was not mentioned nor referred to or implied even once the evidence at trial.  Race as a key identifying feature of the prime suspect in the case was necessarily and appropriately discussed.

---

[8] Defendants' reference to Juror Jean Shonka, quoted in the Minneapolis Star Tribune, in support of the proposition that the jury's verdict was intertwined with issues of race.  See Defendants' Memo, p. 9.  Ms. Shonka's newspaper interview was not given under oath, and the Court has no way of knowing whether she was even quoted accurately.  Regardless, Ms. Shonka did not even say anything about race and her statement in no way implies that Plaintiff improperly introduced racial discrimination as a theme in this case.
[9] See Defendants' Memo, p. 10.

### b. The Court's Rulings Regarding the Admission of Evidence of Plaintiff's Background were Balanced and Appropriate.

Defendants argue, at great length, that the Court unfairly prejudiced them through its rulings on the admissibility of evidence regarding Plaintiff's background, and its rulings excluding evidence regarding Plaintiff's tax records.[10]

These issues have been extensively briefed to the Court in Motions in Limine[11], and argued at two separate pretrial conference hearings, held on August 28, 2007 and September 4, 2007.[12]   Ultimately, the Court's rulings were balanced and largely favored Defendants, in that the Court excluded evidence regarding many of the most critical aspects of Plaintiff's background.  Specifically, the Court barred Plaintiff from offering any evidence or testimony regarding the following background facts:

- Plaintiff's mother told him as a child to always comply with police;

- Plaintiff participated for many years in Junior Achievement, both as a high-school student and, later, as a volunteer mentor and instructor;

- Plaintiff worked extensively as a volunteer speaker for Infinity Systems;

---

[10] See Defendants' Memo, pp. 10-17.

[11] See Plaintiff's Motion in Limine to Exclude IRS and Tax-Related Evidence (Docket No. 61); Defendants' Memorandum of Law In Opposition to same (Docket No. 78).

[12] See the Court's Order on Motions in Limine, at Docket No. 108 (ruling on the parties' evidentiary motions).

- In the fall of 1994, Plaintiff volunteered for the Minneapolis Neighborhood Revitalization Program, and worked to secure a $32,000 grant from the McKnight Foundation to fund the program;

- In 1995, Plaintiff was selected as one of ten McKnight Foundation Award recipients for his community service work;

- In 1997, Plaintiff was recognized with the City Business "40 Under 40" Award, which annually honors Minnesota businesspeople under age 40 for their professional and personal accomplishments;

- Plaintiff has worked with the Golden Valley City Council to remove rental tenants engaged in illegal activity in his neighborhood; and

- Prior to April 2, 2005, Plaintiff had never been arrested or charged with any crime whatsoever nor had he ever personally had any previous difficulties with police.

The Court further ruled against Plaintiff by barring any reference to other claims or complaints against the Golden Valley Police officers involved in his arrest.  The Court also excluded no fewer than 11 of Plaintiff's proffered exhibits, and ordered redaction of six more.  Plaintiff was prevented from admitting any exhibits to document the City's wholesale failure to investigate Plaintiff's arrest, before finding his complaints unfounded.[13]  This would have raised further evidence of the City's covering up what they knew to be wrongful conduct.  In

---

[13] See the Court's Order on Motions in Limine, at Docket No. 108 (ruling on the parties' evidentiary motions).

addition, Plaintiff was prevented from introducing evidence that the City was dilatory in providing recordings of police communications regarding the subject incident. This would have raised a further inference of wrongdoing.

Taken in this context, the Court's rulings admitting only a small percentage of evidence regarding Plaintiff's background was consistent with the Court's goalkeeping, evidentiary function. The Court excluded virtually everything except basic background information allowing Plaintiff the opportunity to tell the jury, in general terms, who he is. The challenged evidence regarding Plaintiff's background was also proper because of its obvious relevance to the diagnoses of the treating physicians.

Defendants further argue they were unfairly prevented from presenting evidence regarding Plaintiff's tax records, and the fact that he withdrew claims regarding his injured knee and lost wages.[14] Again, these issues have previously been briefed and argued to the Court. <u>Contrary to Defendants' innuendo, there is no evidence that Plaintiff's tax returns were altered or irregular in any way, nor is there anything sinister about the fact that his filing of them was delayed</u>. Similarly, Plaintiff's withdrawal of claims related to his wage loss and knee injury implies <u>nothing</u> about the veracity of those claims, nor about Plaintiff's credibility. Plaintiff had every right to pursue those claims, and to make the tactical decision to withdraw them prior to trial. The Court's exclusion of evidence on these matters was well within the Court's discretion, and did not unfairly prejudice the

---

[14] <u>See</u> Defendants' Memo, pp. 12-17.

defense of this case, particularly when it is balanced against the Court's exclusion of virtually all evidence regarding the positive aspects of Plaintiff's background.

      **c.    The Court Instructed the Jury That Plaintiff's Arrest Was Supported by Probable Cause, and if Anything this Instruction Was Unfairly Prejudicial to Plaintiff.**

Again, Defendants seek review of an issue that has been fully briefed and argued to the Court – their proposed Instructions regarding the lawfulness of Plaintiff's arrest.[15]  Defendants go as far as to argue that "testimony implied the arrest of Plaintiff was improper, and the jury was not properly instructed the arrest was lawful."[16]

As the Court will recall, Defendants asked the Court to take judicial notice that Plaintiff's arrest was lawful, and give the jury instructions including no fewer than five references to his "lawful arrest."  As Plaintiff argued at the time,[17] the requested instructions would have been confusing and unfairly prejudicial – indeed, they would be tantamount to a judicial finding that Plaintiff's claims being submitted to the jury were baseless.

In lieu of the requested "lawful arrest" instructions, the Court instructed the jury:

> As you know from the testimony, Mr. Hixon's arrest arose out of the robbery of a US Bank inside a Byerly's supermarket in Golden Valley.  It was later determined that

---

[15] See Defendants' Memo, pp. 17-18.
[16] See Defendants' Memo, p. 18.
[17] See Plaintiff's Motion in Limine to Exclude Reference to Plaintiff's Arrest as Lawful (Docket No. 98).

Mr. Hixon was not involved in the bank robbery. Nevertheless, I have concluded that the Defendant officers had probable cause, or sufficient reason, to take Mr. Hixon into custody in connection with that robbery. The fact that the officers had cause to arrest Mr. Hixon in connection with the robbery, however, does not mean that they had the right to use excessive force when making that arrest. Therefore, the question that you must answer in this case is whether the amount of force used by the officers was excessive, or was it reasonably necessary.[18]

The Court's Instruction clearly told the jury that Plaintiff's arrest was supported by probable cause (as the Court found in its ruling on Defendants' Motion for Summary Judgment). Defendants were not entitled to any additional instructions on this issue, and giving the numerous "lawful arrest" instructions requested by Defendants would have constituted legal error. As it was, because the issue of probable cause was not before the jury, Plaintiff believes there was no basis to give the instruction that was ultimately given. This instruction created a monumental additional hurdle for Plaintiff to overcome in a case that already had several hurdles for the Plaintiff.

Defendants further argue the Court erred in admitting limited information regarding the fact that Defendant Hernandez referred Plaintiff for a criminal charge that was later withdrawn.[19] The Court has previously heard argument on this issue. This evidence was clearly relevant to showing that Plaintiff did not in fact resist arrest. It was evidence of the officers' credibility and veracity. Moreover, Defendants' bad-faith efforts to charge Plaintiff with a crime he never

---

[18] See the Court's Jury Instruction No. 7 (Docket No. 122).
[19] See Defendants' Memo, p. 18.

committed constituted a deliberate cover-up of their unwarranted use of force toward Plaintiff, and thus reflect Defendants' consciousness of guilt and was directly related to the issue of punitive damages.

**3.      The Court's Decision to Allow Expert Testimony by Plaintiff's Treating Physicians Was Proper As a Matter of Law.**

Defendants next turn to another issue on which the Court has received briefs and argument:  the issue of whether Plaintiff's treating psychiatrist, Dr. John Shirriff, and treating psychologist, Ginny Jacobs, would be permitted to testify on their experience in treating Mr. Hixon, including their diagnoses of chronic post-traumatic stress disorder ("PTSD") and depression.[20]

Rather than re-arguing the facts and law previously briefed to the Court, Plaintiff points the Court to its prior Memoranda on this topic.[21]  In sum, Plaintiff provided all required notice regarding the identities and expected testimony of Dr. Shirriff and Ms. Jacobs, ensuring that Defendants suffered no unfair prejudice through their testimony.  Defendants were at all relevant times free to depose these witnesses to learn the substance of their testimony.  Moreover, all medical professionals who examined Mr. Hixon, including the Defendants' independent medical examiner, agreed he suffered from severe, chronic PTSD and depression related to the subject incident.  The notion that Defendants could somehow have

---

[20] See Defendants' Memo, pp. 19 – 29.
[21] See Plaintiff's Memorandum of Law in Response to Defendants' Motion in Limine to Exclude Expert Testimony (Docket No. 81) and Plaintiff's Memorandum of Law in Response to Defendants' Motion in Limine to Exclude Medical Records (Docket No. 87).

been surprised or unfairly prejudiced by the testimony of Dr. Shirriff or Ms. Jacobs is absurd.

As it relates to the present Motion, the Court fully satisfied its gatekeeping duties in considering and ruling on the admissibility of opinion testimony by his treating physicians, an arena in which the law affords the Court broad discretion. See Wagner v. Hesston Corp. 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted).  In Wagner, the Eighth Circuit stated:

> [T]rial courts must serve as gatekeepers to 'insure that proffered expert testimony is both relevant and reliable . . . Trial courts are given broad discretion in fulfilling this gatekeeping role, and on appeal we will not disturb a decision concerning the exclusion of expert testimony absent an abuse of that discretion.

Id.

Defendants further argue that Dr. Shirriff and Ms. Jacobs were improperly permitted to testify regarding the opinions of Dr. Cris Johnston, Defendants' independent medical examiner, who concurred with their diagnoses of PTSD and depression.[22]  Defendants' arguments are inapposite.  As Plaintiff has previously briefed and argued to the Court, Dr. Johnston's report was itself admissible as a business record.[23]  The Court elected to exclude the report, but allowed Dr. Shirriff and Ms. Jacobs to testify regarding Dr. Johnston's findings.  This was legitimate evidentiary gatekeeping by the Court, and perfectly permissible under Federal Rule of Evidence 703.  To the extent Defendants were truly concerned about Dr.

---

[22] See Defendants' Memo, pp. 26-28.
[23] See Plaintiff's Motion in Limine For Admission of Independent Medical Examination Report of Dr. Cris Johnston (Docket No. 99).

Shirriff's ability to accurately describe the tests used by Dr. Johnston and their results[24], they were obviously free to call Dr. Johnston as a witness or introduce his report on cross-examination or impeachment evidence, Plaintiff specifically offered Defendants the opportunity without objection to call Dr. Johnston, notwithstanding the fact that Defendants had not put Dr. Johnston on their witness list.   In any event, given that Dr. Johnston was just one of the <u>four</u> medical providers who reached an identical diagnosis in this case (including Dr. Karen Kramer, Dr. Shirriff, Ms. Jacobs, and Dr. Johnston), this evidence could have had no appreciable prejudicial effect against the Defendants.

Defendants finally argue that they were unfairly prejudiced by Ms. Jacobs' testimony regarding the findings of the Courage Center that Mr. Hixon suffers from cognitive impairments consistent with a traumatic brain injury.[25]  <u>Defendants never objected to this evidence at trial</u>, and are thus estopped from using it as the basis for requesting a new trial.  <u>See</u> <u>U.S. v. McBride</u>, 862 F.2d 1316, 1319 (8th Cir. 1988) (citations omitted) (holding that a party's "failure to object to an alleged error generally precludes him from asserting the claimed error in a motion for new trial . . . Counsel cannot stand idly by, permit the presentation of erroneous matter at trial, and then complain about the inclusion of that evidence in the trial record, absent plain error").   Moreover, Ms. Jacobs' testimony on this issue was well within her own expertise and training.   Ms. Jacobs testified that the Courage

---

[24] <u>See</u> Defendants' Memo, pp. 26-27.
[25] <u>See</u> Defendants' Memo, pp. 28-29.

Center's records and diagnosis were relied upon in her treatment of Plaintiff.  In any event, this testimony was hardly a cornerstone of Plaintiff's case – it was never even referred to in Plaintiff's closing argument – and its inclusion could not have created significant prejudice to Defendants.

**B.   THE JURY VERDICT IN THIS CASE WAS REASONABLE, AND SHOULD BE UPHELD IN FULL.**

**1.   Legal Standard For Remittitur.**

A district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience.  See American Business Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1146 (8th Cir. 1986) (citation omitted); see also Thorne v. Welk Investment, Inc., 197 F.3d 1205, 1212 (8th Cir. 1999) (holding that "[a] verdict is not excessive unless the result is monstrous or shocking").  An award of damages is not "grossly excessive" because the Court would have awarded a lesser amount, but because the evidence admitted at trial cannot support it.  See Kociemba v. G.D. Searle & Co., 707 F. Supp.  1517, 1536 n.19 (D.Minn.1986).

**2.   Plaintiff's Mental Injuries Alone Warranted the Jury's Compensatory Damages Award.**

Defendants take issue with the size of the jury's award, first arguing that Plaintiff's relatively modest medical billing and "lack of medical costs" do not support the award.[26]  The cases Defendants cite for this proposition are totally

---

[26] See Defendants' Memo, pp. 30-31.

inapplicable to this case, and there was ample evidentiary support for the jury's verdict in the present case. Defendants' arguments must fail.

Defendants first cite the Eighth Circuit case of In re. Air Crash at Little Rock, Ark., 291 F.3d 502 (8th Cir. 2002) for their curious argument that damages for mental injury must proximately flow from physical injuries caused by a defendant's conduct (similar to the common-law elements of intentional infliction of emotional distress).[27] Defendants have, in omitting any information regarding the facts of this case, completely misstated its holding. In re. Air Crash at Little Rock, Ark. interprets what damages are available under the Warsaw Convention in the event of an airline accident. The language Defendants have quoted, stating that "damages for mental injury must proximately flow from physical injuries caused by the accident" is a holding under the Warsaw Convention and has no application in this case. See In re. Air Crash at Little Rock, Ark., 291 F.3d 502, 512 (stating "[i]n sum, our holding today is that emotional damages are recoverable under the Convention to the extent that they are caused by physical injuries suffered in the accident"). There is no legal support for Defendants' proposition in a Section 1983 excessive force case or assault and battery case.

Defendants next cite the case of Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040 (8th Cir. 2002), to justify remittitur on the issue of Mr. Hixon's emotional damages. Again, this case is totally inapplicable. Brown involved a plaintiff, Carolyn Anne Brown, who, while suffering from multiple sclerosis, was

---

[27] See Defendants' Memo, p. 30.

reassigned to different job responsibilities in violation of the Americans with Disabilities Act.   The Eighth Circuit noted that "Brown testified that the reassignment 'embarrassed' her and caused her to suffer a 'hurt ego' and a loss of self-esteem," but also observed that, <u>unlike Mr. Hixon</u>, "Brown presented no evidence that the reassignment . . . forced her to seek psychological treatment." <u>Brown</u>, 286 F.3d at 1044.   The jury awarded Ms. Brown $140,000 for her emotional distress, and the trial court reduced the award to $50,000 on remittitur. <u>Id.</u>   Ms. Brown's "hurt ego" is in no way comparable to Mr. Hixon's severe, chronic PTSD and depression, particularly since she, unlike Mr. Hixon, sought no treatment and had no apparent mental-health diagnosis.

     <u>Martinez v. Port Auth.</u>, 445 F.3d 158 (2d Cir. 2006), also cited by Defendants[28], is not binding authority on the Court and, in any event, supports Plaintiff's position that there should be no remittitur in this case.   In <u>Martinez</u>, the jury initially awarded a total of $1,100,000 in damages for emotional distress and mental anguish based on mental-health billing totaling $1,000 (effectively a multiplier of 1,100 times the plaintiff's bills).   The district court reduced this amount to $360,000 (a 360-times multiplier).   Here, Plaintiff suffered significant physical and mental damages, with total billing of $7,739.79, and received a jury award of $328,000 in compensatory damages, <u>including</u> his $7,739.79 in bills (effectively a 42-times multiplier of his total billing).   This 42-times multiplier for pain and suffering and emotional and mental distress is not only vastly less than

---

[28] <u>See</u> Defendants' Memo, p. 31.

the initial award in <u>Martinez</u>, it is nearly nine times smaller than the court's award in <u>Martinez</u> <u>after</u> remittitur was applied.

Ultimately, whether Defendants wish to acknowledge it or not, the evidence in this case was overwhelming that this incident has the evidence in this case was overwhelming that this incident has egregiously and acutely adversely affected Mr. Hixon's life possibly forever.   Sheri Hixon, Dr. Verna Price and Dennis Hodgdon all testified that Mr. Hixon has been transformed by this brutal arrest from a gregarious, loving family man to a shell of his former self.   The enormous impact of this event is further demonstrated by the fact that every mental health professional who has seen Mr. Hixon, including the Defendants' independent medical examiner, agrees he suffers from severe, chronic PTSD and depression caused by this event.   The damages evidence in this case was largely uncontroverted and not seriously disputed at trial.   There is no basis for finding the jury's $328,000 compensatory damages award "grossly excessive," and thus no basis for remittitur in this case.

**3.     <u>The Jury's Punitive Damages Award Was Amply Justified to Punish and Deter Based on the Facts of this Case, and Should Be Upheld</u>.**

"Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct."   <u>Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 266-67, 101 S.Ct. 2748, 2759 (1981).

> Factors to consider in determining the reasonableness of a punitive damages award include the degree of reprehensibility of the defendant's conduct, the ratio or relationship between the actual harm inflicted on the plaintiff and the punitive damages award, and civil [or criminal] penalties authorized or imposed for comparable misconduct.

Kim v. Nash Finch Co., 123 F.3d 1046, 1067 (8th Cir. 1997), citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 560, 116 S.Ct. 1589, 1592 (1996).

"The dominant consideration for assessing the constitutionality of a punitive damages award is the reprehensibility of the defendant's conduct." Williams v. ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir.2004) (citing Gore, 517 U.S. at 575, 116 S.Ct. at 1599).

> With respect to the first guidepost, reprehensibility, the courts are to consider five factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Diesel Machinery, Inc. v. B.R. Lee Industries, Inc., 418 F.3d 820, 839 (8th Cir. 2005), citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513 (2003).

Here, the first and most critical of the Gore factors, reprehensibility, strongly favors upholding the jury's award of punitive damages. Plaintiff proved that Defendant Hernandez used severe and excessive force in arresting him, including but not limited to standing on Plaintiff's neck and blasting him directly in the face with pepper spray after he was handcuffed. Defendants then lied about

their conduct and tried to cover for their conduct by trying to charge Plaintiff with an entirely false charge.   A charge that was soon thereafter dropped when reviewed by the Deputy Chief.   Plaintiff further showed Defendants' cover for their actions and indifference toward the rights of Plaintiff as Defendants held Plaintiff handcuffed like a common criminal for more than one hour while he suffered from the effects of pepper spray, denying him medical care or the opportunity to rinse his face or call his wife.   All of this, after they undisputedly knew he was innocent.   Again, all of this to cover for their excessive use of force. The damage from the excessive use of force was clearly exacerbated by these ongoing actions and decisions of abuse.

The jury's verdict also specifically demonstrates their belief that Defendant Hernandez lied about his actions, including perjuring himself at trial, in his denial of wrongdoing.   As for the applicable Campbell factors for reprehensibility, three of the five indicators are clearly present: the harm caused to Plaintiff was physical rather than economic, Defendant Hernandez's conduct showed a reckless disregard for Plaintiff's rights and safety, and the harm to Plaintiff was the result of intentional malice by Defendant Hernandez.   Defendant Hernandez's conduct was, by any rational standard, reprehensible.

The second Gore factor, the ratio between the punitive damages award and the actual harm inflicted on Plaintiff, also clearly militates in favor of the jury's verdict.   The jury's $450,000 punitive damages award was less than 1.5 times its compensatory damages award.   See Kim, 123 F.3d at 1068 (describing a three-to

one ratio between punitive damages and compensatory damages, including pain and suffering as "relatively unremarkable"); see also Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 829 (8th Cir.2004), *cert. denied*, 543 U.S. 1150, 125 S.Ct. 1322, 161 L.Ed.2d 112 (2005) (affirming a ratio of approximately 4.5 to one); Diesel Machinery, Inc., 418 F.3d at 839 (upholding a four-to-one ratio).

The final Gore factor, the civil or criminal penalties authorized for similar misconduct, also supports the jury's award. Here, Defendant Hernandez's assault and battery of Mr. Hixon are tantamount to at least third-degree assault under Minnesota Statute section 609.223. This offense is a felony. Obviously the Minnesota criminal code considers this a serious offense, and certainly one punishable by significant punitive damages.

Notwithstanding the overwhelming evidence of malicious conduct and deliberate indifference by Defendants in this case, and the fact that Plaintiff's substantial damages were completely unrebutted, Defendants argue, without support in the record, that the jury's punitive damages award must have been the result of passion and prejudice.[29]  Simply put, there is no evidence to suggest any improper passion or prejudice by the jury in this case. As discussed above, the Court prevented the jury from considering any improper evidence or argument, and every member of the venire and jury in this case was Caucasian. The punitive damages award in this case was a direct function of Defendant Hernandez's gratuitous, malicious use of force toward a restrained, compliant, innocent man,

---

[29] See Defendants' Memo, p. 35.

and the completely unapologetic attitude shown by Defendant Hernandez and his colleagues at trial.  There is no basis for presuming any passion or prejudice, and Defendants have failed to meet their burden of showing any.

Moreover, notably, it was clear in this case that significant punitive damages were necessary to deter "Defendants and others from engaging in such misconduct in the future."[30]   Defendants themselves, during their direct examination of Sergeant Dennis Arons, elicited testimony from Sergeant Arons that he was proud of the way his officers had handled Plaintiff's arrest, and that he hoped they would handle similar future arrests in the same way.  This comment typified the Defendants' attitude during this case.  Sergeant Arons' sentiment ignores not only the brutality of Defendant Hernandez's actions but also Defendants' conduct and treatment of Mr. Hixon once it was clearly established he was an innocent bystander, including holding Mr. Hixon handcuffed and denying him needed assistance for more than one hour and then referring him for bogus criminal charges to rationalize Defendant Hernandez's use of force.  Sergeant Arons' "pride" demonstrated to the jury that significant punitive damages were required to send a deterrent message to Defendant Hernandez and his colleagues, since it was clear the Golden Valley Police Department would not clean up its act on its own.

Plaintiff's punitive damages award must be upheld in full.

---

[30] See the Court's Jury Instruction No. 11 (Docket No. 122).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for New Trial or In the

Alternative Remittitur is without legal basis, and must be denied in full.

DATE:  November 6, 2007                  PARKER ROSEN, L.L.C.


                                          By:___s/Andrew D. Parker_____
                                             Andrew D. Parker      # 195042
                                             Anthony G. Edwards    # 342555
                                             133 First Avenue North
                                             Minneapolis, Minnesota 55401
                                             Telephone: (612) 767-3000

                                          ATTORNEYS FOR PLAINTIFF
                                          ALJUAN C. HIXON