# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Aljuan C. Hixon,

                                    Plaintiff,

                                                            Civ. No. 06-1548 (RHK/JSM)
                                                            **MEMORANDUM OPINION AND
                                                            ORDER**

v.

City of Golden Valley, *et al.*,

                                    Defendants.

---

Andrew D. Parker, Anthony G. Edwards, Parker Rosen, L.L.C., Minneapolis, Minnesota,
for Plaintiff.

Jon K. Iverson, Susan M. Tindal, Iverson Reuvers, Bloomington, Minnesota, for
Defendants.

---

This matter came on for trial before the undersigned and a jury between September

6, 2007, and September 11, 2007.  On September 13, 2007, the jury returned a verdict

finding Defendant Mario Hernandez liable under 42 U.S.C. § 1983 for violating Plaintiff

Aljuan Hixon's Fourth-Amendment right to be from the use of excessive force.  The jury

awarded Hixon $328,000 in compensatory damages and $450,000 in punitive damages.

On September 18, 2007, the Court adopted the jury's verdict, and on October 3, 2007, the

Court entered judgment against Hernandez and his employer, the City of Golden Valley

(the "City").[1]

---

[1] The City was included in the Judgment because (1) it was liable under the doctrine of
*respondeat superior* and (2) it previously represented to the Court that it would indemnify

These two Defendants[2] now move for a new trial or, in the alternative, remittitur of the damage awards.  For the reasons set forth below, the Court will deny the Defendants' Motion.

## ANALYSIS

### I.    New Trial

The Defendants seek a new trial based on several evidentiary errors allegedly committed by the Court.  A new trial on the basis of evidentiary errors is warranted only when the errors were so prejudicial that a new trial, absent the errors, "would be likely to produce a different result."  Pointer v. DART, 417 F.3d 819, 822 (8th Cir. 2005) (citation omitted); see also Fed. R. Evid. 103(a).  Moreover, "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice."  Harris v. Chand, __ F.3d __, 2007 WL 3342197, at *1 (8th Cir. Nov. 13, 2007) (quoting McPheeters v. Black & Veatch Corp., 427 F.3d 1095, 1100 (8th Cir. 2005)); accord Fed. R. Civ. P. 61. The "errors" cited by the Defendants, whether taken individually or cumulatively, are insufficient to satisfy this standard.

### A.    Evidence of race

The Defendants first argue that Hixon improperly injected evidence of race into the trial, even though that subject had been declared "off limits" by the Court before the

Hernandez in the event of an adverse verdict.  (See Order for Judgment (Doc. No. 103) at 2.)

[2] Hereinafter, the Court will refer to Hernandez and the City as "the Defendants."

trial began.  (Def. Mem. at 7-10.)  The Defendants, however, overstate the Court's pre-

trial rulings.  At summary judgment, the Court ruled that Hixon's claim of *racial*

*discrimination* did not present a genuine issue of material fact, and it dismissed that

claim.  As a result of this ruling, it also cautioned Hixon at several pre-trial conferences

that evidence concerning *racial discrimination* could not be offered at trial.

The Court, however, never declared the subject of race completely "off limits" at

trial.  Indeed, race was a key part of Hixon's case, as it was directly relevant to the

arresting officers' credibility.  In this "he said, she said" case, such evidence was critical;

as one of the cases cited by the Defendants notes, "this claim by a black plaintiff against

white police officers rests largely on the word of [Hixon] against that of the police. *Such*

*a case, of necessity*, *brings the credibility of the witnesses sharply into focus . . . ."*

Sanders-El v. Wencewicz, 987 F.2d 482, 484 (8th Cir. 1993) (emphasis added).  In

particular here, all of the officers testified at trial that they heard from a police radio

transmission that a black male was involved in the bank robbery.  Yet, the radio

transmissions concerning the robbery, which were played for the jury, indicated only that

a white male suspect was involved.  Moreover, several of the officers did not indicate in

their written reports that they received broadcast information that a black male was

involved in the robbery.  Accordingly, it was appropriate to devote "[s]ubstantial time [to]

the fact the bank robber was white and whether the officers knew a black male was

associated with the getaway van" (Def. Mem. at 8), because such evidence tended to

undermine the officers' credibility.

The Defendants also argue that Hixon's treating doctors[3] should not have been permitted to testify about his upbringing in the segregated south during the civil-rights movement. As the treating doctors testified, however, such evidence highlighted the reasons for, and the extent of, the post-traumatic stress disorder ("PTSD") suffered by Hixon following his arrest and pepper spraying. Hence, this evidence was relevant to Hixon's damages.

Moreover, the Court notes that much of the race-based evidence now challenged by the Defendants was unobjected to at trial. For example, the Defendants take issue with Hixon's testimony that, once arrested, he told the officers "if this is a black thing, you've got the wrong black guy." The Defendants neither objected to nor moved to strike that testimony. The Defendants likewise argue that Hixon's treating doctors improperly testified that Hixon told them that he grew up in the segregated south. No objections were lodged by the Defendants when that testimony was elicited. See, e.g., Billingsley v. City of Omaha, 277 F.3d 990, 997 (8th Cir. 2000) (new trial unwarranted based on allegedly improper statements in closing argument where plaintiff failed to object to statements).[4]

---

[3] Although one such individual – psychologist Ginny Jacobs – is not a doctor, for ease of reference the Court refers to Hixon's treating medical professionals, including Jacobs, as his "treating doctors."

[4] Similarly, when Jacobs testified that Hixon had been taught by his mother to obey police officers, no objection was made. Nevertheless, the Court struck that portion of Jacobs's testimony *sua sponte*. Accordingly, even if the Defendants are correct that this testimony was "improper character evidence" under Federal Rule of Evidence 404(a) (Def. Mem. at 10-12), no prejudice resulted because the testimony was stricken from the record, see, e.g. United States v.

Finally, even if the Court *had* erred in admitting some of the racial evidence that the Defendants now challenge, any such errors did not affect the outcome of the trial. The Defendants argue that evidence of prejudice is manifest from a quote made by a white juror, after the trial, in an article published in the Minneapolis Star Tribune: "I've thought about it a million times since the trial. If it had been me, would I have been treated this way?" (Def. Ex. 8 at 3.) Yet, in that same article the same juror stated that race played no role in the jury's deliberations: "We didn't care that he was black, white, purple or green. Our feeling was, no matter what the circumstances, no human being should be handled that way." (Id. at 2.)

Simply put, Hixon's claims necessarily relied on at least some evidence touching upon race. Despite the Defendants' protestations to the contrary, it would have been impossible for this case to have been tried without the jury becoming aware that Hixon is a black male and that the arresting officers were white. That some evidence of the color of the participants was before the jury, however, does not mean that Hixon "improperly

---

Schnurstein, 977 F.2d 449, 455 n.5 (8th Cir. 1992).

In their Reply, the Defendants cite United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988), for the proposition that a party's failure to object to evidence is not fatal and that a district court may grant a new trial based on the erroneous (yet unobjected to) admission of evidence under the plain-error rule. (Reply Mem. at 3-4.) Although McBride dealt with plain error in criminal cases, see id. (citing, *inter alia*, Fed. R. Crim. P. 52(b)), plain-error review also is available in civil cases, see Dole v. USA Waste Servs., Inc., 100 F.3d 1384, 1388 (8th Cir. 1996). Yet, plain-error review applies only "in extraordinary circumstances, [when] the error is so prejudicial as to cause a miscarriage of justice." Id. (alteration in original) (quotation marks omitted). The Court concludes that no "extraordinary circumstances" were present here.

and prejudicially" suggested racial discrimination in proving his case.[5]

### B.     Character evidence

The Defendants next argue that the Court improperly permitted Hixon to introduce evidence of his good character, pointing to (1) Jacobs's testimony that Hixon's mother taught him to obey police officers and (2) Hixon's testimony that he "was a family guy with a good job – a corporate guy." (Def. Mem. at 11.)  As noted above, however, the challenged portion of Jacobs's testimony was stricken from the record. (See supra note 4.)  Moreover, Hixon's "family-guy" testimony was brief and provided little more than background information; it was appropriate to permit him to offer such testimony. See, e.g., United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988) (no error in admitting "background evidence" of defendant's prior military service and completion of two years of college; "considerable leeway is allowed . . . on direct examination for proof of facts that do not bear purely on the legal issues, but merely fill in the background of the narrative") (citation omitted).  The Court excluded a plethora of other references to Hixon's standing in the community that Hixon intended to testify about at trial, because such testimony, in the Court's opinion, would have crossed the line between background evidence and character evidence. See Fed. R. Evid. 404(a) (character evidence generally

---

[5] Because the Court concludes that there was no error concerning race-based evidence, it also concludes that there was no error in denying the Defendants' request for a "curative" instruction on this issue. (Def. Mem. at 10.)

not admissible).[6]  The Court perceives no error in its rulings.

The Defendants also argue that, because the Court (purportedly) erred in admitting evidence of Hixon's good character, they should have been permitted to rebut such evidence.  This argument dies on the vine, because (as discussed above) Hixon did not proffer improper character evidence.  But even if the Defendants were correct that the Court *did* improperly permit Hixon to introduce evidence of his good character, the Defendants' argument would nevertheless fail because the "rebuttal" evidence they point to, in the Court's opinion, would not have suggested that Hixon lacks good character. The Defendants claim that they would have informed the jury that Hixon (1) dropped certain claims prior to trial and (2) delayed filing tax returns for several years.  (Def. Mem. at 12-15.)  Yet, a plaintiff may drop claims as a matter of litigation strategy, or for any of a host of other reasons.  Similarly, there is nothing inherently improper about the delayed filing of tax returns, as long as appropriate extensions are sought (as apparently was the case here).[7]  Simply put, neither category of evidence would have "rebutted" the allegedly "improper" character evidence permitted by the Court at trial.[8]

---

[6] Hixon testified only about his participation in his university's alumni association and the local Lion's Club, as well as his work with the Minneapolis police department concerning gang activity in his neighborhood.  The Court precluded Hixon from testifying about his volunteer work in the community, the recognition he had received for that volunteer work, and his lack of a prior criminal record.

[7] The fact that Hixon sought extensions was represented to the Court by Hixon's counsel.

[8] The Defendants also argue that the tax-return evidence was relevant to Hixon's damages and to his credibility.  (Def. Mem. at 14-17.)  As to the former argument, they assert that Hixon's treating psychiatrist, Dr. John Shiriff, testified at his deposition that the delay in

### C.      Referring to Hixon's arrest as "lawful"

The Defendants next argue that they should have been permitted to refer to

Hixon's arrest as "lawful," because the Court dismissed (at summary judgment) Hixon's

Fourth-Amendment false-arrest claim.  (Def. Mem. at 17-18.)  They also argue that the

Court erred by not instructing the jury that "Plaintiff Aljuan Hixon was lawfully arrested

on April 2, 2005."  (Id.; see also Defendants' Proposed Jury Instruction No. 8 (Doc. No.

66).)  This argument is meritless.

Although the Defendants are correct that the Court previously ruled that there

existed probable cause to effect Hixon's arrest, that does not mean that Hixon's arrest was

"lawful."  The critical error in the Defendants' argument is that it overlooks that an arrest

can be lawful – or unlawful – both in the reason (or lack thereof) for the arrest *and the*

*manner in which it is effected*.  The Court's prior determination that there existed

probable cause to take Hixon into custody does not *ipso facto* lead to the conclusion that

the arrest was "lawfully" effected.  Hence, instructing the jury that Hixon's arrest was

"lawful" would have been both legally erroneous and likely to confuse the jury on the

---

filing tax returns for several years would be a significant psychological stressor and, accordingly, the jury should have been informed of that fact when evaluating the cause of Hixon's PTSD.  (Id. at 15.)  Yet, when asked whether such a delay would be a psychological stressor, Dr. Shiriff answered "[w]ell, it would be *for me*."  (Def. Mem. at 15 (emphasis added).)  This in no way suggests that a delay in filing tax returns caused stress to *Hixon* or was otherwise related to *Hixon's* PTSD.  As for the latter argument, the Court does not believe that Hixon's delay in filing tax returns is a specific instance of "truthfulness or untruthfulness" that is appropriate for cross-examination under Federal Rule of Evidence 608(b).  See, e.g., United States v. Escobar, 50 F.3d 1414, 1424 (8th Cir. 1995) ("civil tax problems cannot be regarded as indicating a lack of truthfulness") (citation omitted).

ultimate issue in this case.  Moreover, the Court made clear in Jury Instruction No. 7 that the officers had <u>probable cause</u> to take Hixon into custody, and that the officers' use of force was the only issue for the jury to consider:

> As you know from the testimony, Mr. Hixon's arrest arose out of the robbery of a US Bank inside a Byerly's supermarket in Golden Valley.  It was later determined that Mr. Hixon was not involved in the bank robbery. Nevertheless, I have concluded that the Defendant officers had probable cause, or sufficient reason, to take Mr. Hixon into custody in connection with that robbery.  The fact that the officers had cause to arrest Mr. Hixon in connection with the robbery, however, does not mean that they had the right to use excessive force when making that arrest.  Therefore, the question that you must answer in this case is whether the amount of force used by the officers was excessive, or was it reasonably necessary.

The Defendants also argue that because there existed probable cause for Hixon's arrest in connection with the bank robbery, it was inappropriate for him to introduce evidence concerning the dismissal of the criminal charge against him.  This argument might have merit if Hixon had, in fact, been referred to the City Attorney's office for prosecution for the bank robbery.  But Hixon was not referred for prosecution for that crime; rather, he was referred *by Hernandez* to the City Attorney's office for prosecution for the crime of obstructing legal process *with force*.  In the Court's view, under the facts of this case the dismissal of the obstruction charge could reasonably be viewed to suggest that the charge was baseless in the first place.  Hence, there was no error in permitting Hixon to introduce evidence concerning the dismissal of that charge, because that dismissal was relevant to Hixon's claim that he did not resist the officers' efforts *with*

*force* and, accordingly, that Hernandez had no basis to use pepper spray on him.[9]

### D.   Expert testimony

The Defendants next argue that the Court erred in allowing Hixon's treating doctors to testify.  They first assert that Hixon failed to disclose the treating doctors as experts in accordance with Federal Rule of Civil Procedure 26(a) and the Court's Scheduling Order in this case.  (Def. Mem. at 19-21.)  The Defendants raised this same argument prior to trial, but at the final pre-trial conference they were unable to identify any prejudice they would suffer as a result of allowing the testimony.  Indeed, the Defendants were fully aware that Hixon's treating doctors would testify that he suffered from PTSD, and *the Defendants' own expert reached the same conclusion after performing an independent medical examination on Hixon.*  Accordingly, even if the Court somehow erred in allowing this testimony, any such error was harmless.

The Defendants also argue that the treating doctors' testimony failed to satisfy Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because the doctors opined that the arrest caused Hixon's PTSD without ruling out other possible causes. (Def. Mem. at 21-25.)  This argument is belied by the record.  Indeed, both treating doctors indicated before trial that they had delved into Hixon's background – including (1) the lack of other life-threatening events in his past, (2) his repeated nightmares about

---

[9] The dismissal of the charge could also reasonably be interpreted to suggest that the officers came up with an *ex post facto* justification for their use of force.  The dismissal of the charge, therefore, was also relevant to (1) impeach the officers' credibility and (2) prove Hixon's claim for punitive damages.

his arrest (and nothing else), and (3) his newfound fear of police officers – before

concluding that his arrest, and *only* his arrest, led to his PTSD.  (<u>See</u> Shiriff Aff. ¶¶ 8-15

(Doc. No. 84); Jacobs Aff. ¶¶ 7-12 (Doc. No. 85).)  And, both testified at trial in

accordance with their pre-trial statements.

        The Defendants also argue that the treating doctors' opinions regarding the cause

of Hixon's PTSD did not satisfy <u>Daubert</u> because they were based solely on Hixon's

perception of the events surrounding his arrest.  They argue that an individual cannot

suffer from PTSD based on a *perception* (like Hixon's) that one's life is in danger; rather,

they contend that one's life must have *actually been* in danger in order to suffer PTSD.

However, the Defendants proffered no expert testimony or other evidence at trial, nor

have they cited any other authority in the instant Motion, indicating that PTSD must be

based on an event that would be considered traumatic to an objective observer, rather than

from an individual's own perspective of the events in question.  Indeed, both of Hixon's

treating doctors testified at trial that what matters is whether the individual *believes* he is

in a life-threatening situation and not whether the situation is actually life threatening.

Simply put, there was no <u>Daubert</u> error here.

        The Defendants next argue that Hixon's treating doctors were improperly

permitted to testify about the medical tests performed by *the Defendants'* expert, who the

Defendants opted not to call at trial.  (Def. Mem. at 26-28.)  They argue that the

testimony was hearsay and that the treating doctors lacked foundation to testify about

medical tests performed by someone else.  Assuming *arguendo* that the Defendants are

correct, the Court believes that the admission of such testimony was harmless.  Indeed,
the tests performed by the Defendants' medical expert merely confirmed Hixon's experts'
opinions; it was cumulative.  Hence, even if the Court had excluded the treating doctors'
testimony concerning those tests, the conclusion that Hixon suffered PTSD as a result of
his arrest would have remained unrebutted in the record.  Accordingly, there was no
prejudice from the admission of such evidence.

Finally, the Defendants argue that Jacobs improperly testified that, in her opinion,
Hixon suffered a traumatic brain injury as a result of the events in question, since she is
not a medical doctor and is unqualified to render such an opinion.  (Def. Mem. at 28-29.)
The Defendants did not object to this testimony, however, and therefore they have waived
any objection to it.  Billingsley, 277 F.3d at 997.  Moreover, the Defendants thoroughly –
and, in the Court's opinion, effectively – cross-examined Jacobs on this issue.  As a
result, even if there had been error in allowing this testimony, it was not so prejudicial as
to warrant a new trial.

For all of the foregoing reasons, the Defendants have failed to demonstrate that the
alleged evidentiary errors – either individually or cumulatively – were so prejudicial that
a new trial, absent the errors, "would be likely to produce a different result," Pointer, 417
F.3d at 822, or that the denial of a new trial would be "inconsistent with substantial
justice," Harris, 2007 WL 3342197, at *1.  Accordingly, their Motion will be denied
insofar as it seeks a new trial.

## II.    Remittitur

The Defendants argue in the alternative to their request for a new trial that the damages awarded by the jury should be remitted by the Court.  In evaluating their argument, the Court must be mindful that the jury's damages calculations are entitled to deference – remittitur is appropriate only where a jury's verdict "is so grossly excessive as to shock the court's conscience."  Am. Bus. Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1146 (8th Cir. 1986); accord Hite v. Vermeer Mfg. Co., 446 F.3d 858, 869 (8th Cir. 2006) (reduction appropriate where damages are "so grossly excessive [that] the result is monstrous or shocking").  The Defendants contend that remittitur is appropriate here because the compensatory-damages award ($328,000) was "extraordinary and with no evidentiary support" and the punitive-damages award ($450,000) resulted from the "passion and prejudice" of the jury.  (Def. Mem. at 29-36.)  The Court does not agree.

### A.   Compensatory damages

Seizing upon language in In re Air Crash at Little Rock, Arkansas, 291 F.3d 503 (8th Cir. 2002), the Defendants first argue that the compensatory damages awarded here were excessive because Hixon failed to prove any link between his physical injuries and his PTSD.  (See Def. Mem. at 30 (arguing that "damages for mental injury must proximately flow from physical injuries caused by [an] accident").)  Absent that link, the Defendants argue that Hixon can recover only for his de minimis physical injuries.  (Def. Mem. at 30-31.)  This argument is both disingenuous and misleading.

As an initial matter, the Court does not agree that the evidence failed to disclose any link between Hixon's physical injuries and his PTSD.  Hixon testified that the pepper

-13-

spray made it difficult for him to breathe, which caused him to believe that he was dying,

and that Hernandez stepped on his neck while pepper spraying him, causing swelling and

bruising.  Certainly, that testimony is sufficient to link Hixon's physical injuries with his

PTSD.

More importantly, however, In re Air Crash at Little Rock addressed a very limited

question:  under what circumstances are damages for emotional distress recoverable

*under the Warsaw Convention*?  Prior to In re Air Crash at Little Rock, the Supreme

Court had held in  Eastern Airlines, Inc. v. Floyd, 499 U.S. 530 (1991), that the

Convention precluded recovery for purely mental or emotional injuries, but expressly left

open the question whether emotional injuries accompanied by physical injuries were

recoverable.  Id. at 552-53.  The Eighth Circuit answered that question in the affirmative

in In re Air Crash at Little Rock, holding that "emotional damages are recoverable *under*

*the Convention* to the extent that they are caused by physical injuries suffered in [an]

accident."  291 F.3d at 512 (emphasis added).

The Defendants have ignored that In re Air Crash at Little Rock's holding was

limited only to the Warsaw-Convention context.  They have cited no cases applying In re

Air Crash at Little Rock in any other arena, in particular excessive-force cases under

Section 1983.  Nor have they cited any excessive-force cases in which courts have

declined to award compensatory damages for mental or emotional injuries absent a

proven nexus to physical injuries.  Indeed, such a result would appear to be contrary to

well-established case law.  See, e.g., Bauer v. Norris, 713 F.2d 408, 413 (8th Cir. 1983)

("Assuming liability is found under section 1983[,] the jury may assess compensatory damages based upon, *inter alia*, . . . the emotional harm suffered (including fear, humiliation and mental anguish) *even though no actual damages are proven . . . .*") (emphasis added); Engeseth v. County of Isanti, Civ. No. 06-2410, 2007 WL 3102074, at *6 (D. Minn. Oct. 23, 2007) (Davis, J.).[10]

The Defendants next argue that the compensatory-damages award lacked evidentiary support.  In their view, the fact that Hixon did not proffer any expert evidence concerning his alleged physical injuries and submitted medical bills totaling only $7,739.79 means that an award of $328,000 in compensatory damages is "clearly excessive."  (Def. Mem. at 31-32.)  Yet, it was undisputed at trial that Hixon suffered physical effects from the pepper spray used during his arrest, including burning eyes, excessive coughing and mucous production, and difficulty breathing, as well as swelling and bruising from Hernandez (who stands 6'6" tall and weighs 280 pounds) stepping on his neck.  More importantly, the undisputed evidence at trial clearly established that, since the date of his arrest (more than 2 ½ years ago), Hixon has suffered from severe

---

[10] At oral argument, the Defendants cited Foster v. Metropolitan Airports Commission, 914 F.2d 1076 (8th Cir. 1990), for the proposition that an excessive-force plaintiff cannot recover for mental or emotional injuries in the absence of physical injuries.  The Defendants' reliance on Foster is misplaced.  First, as discussed above, Hixon did, in fact, suffer physical injuries as a result of the use of pepper spray and Hernandez stepping on his neck.  Second, and more importantly, Foster did not hold that an excessive-force plaintiff must prove physical injuries in order to recover for emotional injuries.  Rather, the Foster court held that the fact that the plaintiff did not suffer permanent injuries as a result of the defendant's conduct was relevant in determining whether the amount of force used by the arresting officer was reasonable.  See 914 F.2d at 1082-83.

emotional injuries.  Both Hixon and his treating doctors testified that he suffers from

PTSD, is withdrawn, has difficulty concentrating, experiences frequent and recurrent

nightmares and flashbacks to the date in question, has a newfound fear of police, is

depressed, and has been agoraphobic.  *This evidence was completely unrebutted by the*

*Defendants* – in fact, their own expert agreed that Hixon suffers from PTSD (an opinion

that resulted in the Defendants opting not to call their expert to testify at trial).  Moreover,

Hixon's wife and friends testified as to the profound impact his arrest has had on his

family life and his ability to work, transforming him from an outgoing, fun-loving person

with a nearly photographic memory to a man who is simply "a shell of his former self."

(Mem. in Opp'n at 24.)  Finally, Hixon's treating doctors both opined that there is no end

date in sight for Hixon's PTSD and that it might never disappear completely.

Based on these significant, and potentially indefinite, emotional injuries, as well as

the physical effects of the pepper spray used on Hixon during his arrest and Hernandez

stepping on Hixon's neck, the Court cannot say that an award of $328,000 in

compensatory damages is so "grossly excessive" that it shocks the conscience.  See, e.g.,

Edman v. Marano, 177 Fed. Appx. 884, 888-89 (11th Cir. 2006) (affirming award of

$225,000 for emotional-distress damages in false-arrest and excessive-force case); Ruiz v.

Gonzalez Caraballo, 929 F.3d 31, 34 (1st Cir. 1991) (affirming $150,000 compensatory-

damage award in excessive-force case based on plaintiff's severe and ongoing PTSD);

Ibanez v. Velasco, No. 96 C 5990, 2002 WL 731778, at *10-12 (N.D. Ill. Apr. 25, 2002)

(declining to reduce $2.5 million compensatory-damage award in excessive-force case

despite fact that plaintiff's physical injuries were "not severe" and plaintiff proffered only

$5,737.33 in medical bills, because of plaintiff's significant emotional injuries, including

PTSD).  Accordingly, remittitur of that award is unwarranted.

### B.    Punitive damages

In their final argument, the Defendants assert that the jury's $450,000 punitive-

damages award must be reduced, claiming that it was the result of passion and prejudice.

The Defendants' argument is not persuasive.

In evaluating whether a punitive-damages award is reasonable, a district court

must consider several guideposts set forth by the Supreme Court in State Farm Mutual

Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), and BMW of North

America, Inc. v. Gore, 517 U.S. 559 (1996).[11]  In particular, a court should consider

(1) the reprehensibility of the defendant's conduct, (2) the ratio between the actual harm

inflicted and the punitive-damages award, and (3) civil or criminal penalties authorized or

imposed for comparable misconduct.  BMW, 517 U.S. at 574-75, 583.  The

reprehensibility factor – which must be the Court's "dominant consideration," Williams v.

ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir. 2004) – itself includes five factors to

consider, namely, (1) whether the harm caused was physical as opposed to economic,

---

[11] State Farm and BMW addressed whether excessively high punitive-damages awards
are unconstitutional because they violate a defendant's due-process rights.  Here, the Defendants
have nowhere argued that the punitive damages awarded by the jury were unconstitutional;
rather, they assert only that the punitive damages resulted from passion and prejudice.  The two
are one-and-the-same, however.  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 467
(1993) (Kennedy, J., concurring) ("When a punitive damages award reflects bias, passion, or
prejudice on the part of the jury, . . . the Constitution has been violated.").

(2) whether the defendant's conduct evinced an indifference to or a reckless disregard for the health or safety of others, (3) whether the victim was financially vulnerable, (4) whether the conduct involved repeated actions or was an isolated incident, and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 839 (8th Cir. 2005). These factors militate against reduction of the punitive-damages award.

First, there can be little doubt that the jury had a sufficient evidentiary basis to determine that the challenged conduct here was clearly reprehensible.  The jury's verdict indicates that it believed Hixon when he testified that he did not struggle with the arresting officers and that he was twice sprayed with pepper spray at point-blank range, despite his lack of resistance, *after* he had already been handcuffed, and did not believe the Defendants' testimony concerning these events.  As the Defendants' own use-of-force expert testified, using pepper spray in that fashion and under those circumstances was wholly unnecessary and improper, and it certainly evinced both malice and indifference to Hixon's health and safety.  Moreover, the pepper spray caused significant physical and emotional harm to Hixon.  In the Court's view, the Defendants' conduct is precisely the type that "warrant[s] the imposition of [punitive damages] to achieve punishment or deterrence." State Farm, 538 U.S. at 419.

Second, the ratio between the actual harm caused and the punitive-damages award is not excessive.  The jury awarded $450,000 in punitive damages after awarding $328,000 in compensatory damages; the ratio between these two figures is less than 2-to-

1.  While the Supreme Court has declined to draw any mathematical bright lines between constitutional and unconstitutional punitive-damage ratios, it has noted that "few awards exceeding a single-digit ratio between punitive and compensatory damages" are acceptable.  Id. at 425.  Here, the ratio is well within the single-digit range.[12]

Third, the criminal penalties available for misconduct comparable to that at issue here support the punitive-damage award.  At a minimum, the unwarranted pepper spraying of another person constitutes an assault in the fifth degree under Minnesota Statutes section 609.224.[13]  The fine that may be imposed for such conduct is $3,000, and the offender may be jailed for up to one year.  Id.  Although the punitive damages here are "much in excess of the fine that could [have] be[en] imposed" under Minnesota law, Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991), the possibility of a jail sentence helps to ameliorate that disparity, see id. (punitive-damages award upheld despite wide gap between possible fine and award, since incarceration was also authorized under state statute); see also Stogsdill v. Healthmark Partners, L.L.C., 377 F.3d 827 (8th Cir. 2004) (applying Arkansas law) (reducing jury's punitive-damages award from $5 million (500 times the state-law penalty) to $2 million (200 times the state-law penalty) where state

_____

[12] The Defendants disingenuously argue that the punitive damages "were over 58 times [Hixon's] actual damages" (Def. Mem. at 33; accord Reply Mem. at 5), citing the fact that Hixon proffered medical bills totaling less than $8,000.  Their argument ignores that the "actual damages" awarded to Hixon were $328,000 and were not limited to the medical bills he introduced at trial.

[13] Section 609.224 makes it unlawful to "intentionally inflict[] . . . bodily harm upon another."  Minn. Stat. § 609.224, subd. 1(2).  "Bodily harm" means, inter alia, "physical pain or injury . . . or any impairment of physical condition."  Minn. Stat. § 609.02, subd. 7.

statute also authorized imprisonment for up to six years for similar conduct).[14]

Insofar as all of the relevant factors weigh against remittitur, the Court will not reduce the punitive-damages award.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, the Court concludes that a new trial is not necessary in order to comport with "substantial justice," Harris, 2007 WL 3342197, at *1, and that the damages awarded by the jury are not "so grossly excessive [that] the result is monstrous or shocking," Hite, 446 F.3d at 869.  Accordingly, **IT IS ORDERED** that Defendants' Motion for New Trial or in the Alternative Remittitur (Doc. No. 146) is **DENIED**.

Dated: November 29, 2007                              s/ Richard H. Kyle
                                                      RICHARD H. KYLE
                                                      United States District Judge

---

[14] An unjustified pepper spraying could be considered assault in the third degree under Minnesota Statutes section 609.223, subdivision 1, which includes greater penalties (a $10,000 fine and imprisonment for up to five years) than those available under Section 609.224.  The pertinent difference between assault in the third degree and assault in the fifth degree is that the former requires "substantial bodily harm" while the latter requires only "bodily harm." "Substantial bodily harm" means, *inter alia*, "bodily injury . . . which causes a temporary but substantial loss or impairment of the function of any bodily member or organ."  Minn. Stat. § 609.02, subd. 7a.  It is unclear whether Hixon's physical and mental injuries would satisfy this definition.